Leon A. WILSON, Appellant,

v.

UNITED STATES, Appellee.

No. 86–339.

District of Columbia Court of Appeals.

Argued Feb. 9, 1989.
Decided May 9, 1989.

Jonathan Zucker, appointed by this court, for appellant.

Gregory E. Jackson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Helen M. Bollwerk and Ellen Bass, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

This case presents a collision between the right of a criminal defendant to call a witness in his own defense and the privi-lege of that witness not to incriminate him-self. Appellant Leon A. Wilson asks us to set aside his conviction of taking property without right (TPWR) in violation of D.C. Code § 22–3816 (1987 Supp.). He contends that the trial judge committed reversible error by sustaining a blanket invocation of the privilege against self-incrimination by a prospective defense witness, Samuel Lee, and by permitting Lee not to take the wit-ness stand at all, thus depriving Wilson of what he hoped would be exculpatory evi-dence. Wilson claims that the judge did not conduct a sufficient inquiry, that Lee's risk of prosecution was fanciful rather than real or substantial, and that a narrow-er privilege would have adequately protect-ed Lee's rights.

As events developed, there came a time during the trial when the prospect that Lee would be prosecuted might have been viewed as remote. We conclude, however, that at the time when the trial judge ruled on the issue, Lee was entitled to invoke a blanket privilege. Wilson's counsel had pressed the trial judge for an early ruling and, after Lee's claim of privilege was sus-tained, counsel neither asked the judge to review her decision nor raised the issue again in any other way. The judge was not required to modify, on her own initiative, a ruling which was correct when made. Ac-cordingly, there was no error, and we af-firm Wilson's conviction.

I

## THE FACTS

Wilson was tried by the court, sitting without a jury. The government's evi-dence consisted of eyewitness testimony. George Gelestino, Jr. related that on May 4, 1985, he was shopping at the Penguin Feather Record Shop on M Street, N.W. in the Georgetown section of Washington, D.C. when he observed a man whom he later identified as Wilson slip several com-pact discs into his jacket. When Gelestino tried to alert the sales clerk about what had happened, a woman who appeared to be the thief's accomplice gave him a "dirty look" and blocked his path. As Gelestino

was telling a sales clerk what had happened, he saw the woman signal the man to leave.

Michael Pelander, who was in charge of the operations of several Penguin Feather stores, testified that he came on the scene as the thief was leaving the establishment with a bulge under his partially zipped green nylon jacket, which he said was reversible to yellow. After the man reached the street, a woman signaled him to leave the scene. Suspecting that mischief was afoot, Pelander went into the store and asked whether any merchandise had been stolen. Learning that there had indeed been a theft, Pelander left the store in the hope of apprehending the miscreant. Seeing no sign of the man, he approached the suspected accomplice. He questioned her about the crime, but she denied any knowledge of it. In the meantime, the suspect had fled with his booty, and the prospects of apprehending him appeared bleak.

On July 7, 1985, however, there was a break in the case. Pelander was at another Penguin Feather outlet, this one in Wheaton, Maryland, waiting on a female customer. Suddenly, he noticed a man in the store whom he immediately recognized as the perpetrator of the theft in Georgetown two and a half months earlier. He later concluded that the woman with whom he had been talking was the same person who had assisted the thief in the Georgetown caper. Pelander telephoned the local police, but as he was calling, the two suspects drove away in a late model Pontiac. Pelander adroitly noted that the license number of the vehicle in which the two of them had effected what they surely assumed to be their provident departure was either JDS 546 or JDS 246. Pelander provided this information to the Montgomery County police and later to the Metropolitan Police Department. The police were able to determine that appellant Leon A. Wilson was the owner of the car in question. The second sighting and Pelander's prompt report had enabled the police to focus on a suspect.

The police promptly prepared a photo array containing nine photographs, the fourth of which was Wilson's. Gelestino and Pelander viewed the array separately and each was asked whether he could make an identification. The results were inconclusive. Gelestino failed to identify anyone. He initially stated that he was certain that No. 4 was not the perpetrator, but nevertheless apparently studied Wilson's photograph for a longer time than he looked at the others. Pelander was also unable to make a positive identification. He told police, however, that "the person in the fourth photograph looked most like the person that I saw both in Wheaton and in Georgetown, but his complexion was darker more like the person in the next to last photograph." Officer Rosanne Garrett, who supervised the identification proceeding, also testified that there was no definite identification made, but claimed that both witnesses said that No. 4 resembled the perpetrator more than the other eight photographs did.

After the witnesses had made these less than decisive observations, Officer Garrett obtained a warrant for Wilson's arrest.[1] The warrant was executed, and Wilson was duly charged and ordered to attend a lineup. As luck—not Wilson's—would have it, Pelander was putting money into a parking meter outside police headquarters on the day of the lineup when he recognized Wilson, as well as the Pontiac with the tell-tale license plate, in front of his own vehicle. Later that day, Pelander positively identified Wilson at the lineup, and did so again in open court when the case came to trial. Gelestino did not attend the lineup, but he

---

1. The manner in which this warrant was obtained is troubling to say the least. In her affidavit in support of the warrant, Officer Garrett stated in two separate places that R–1 (Pelander) "identified the defendant (# 4), as the subject that he had chased and saw again at his Wheaton store." Judge Ronald P. Wertheim issued the warrant on the basis of this affidavit, of which we now know that the central representation was untrue. Whether deliberate or inadvertent, this kind of misdescription of the facts cannot be tolerated, especially where, as here, a citizen's liberty was at stake. *See Sanders v. United States,* 550 A.2d 343, 347–48 (D.C. 1988) (concurring opinion).

too made a positive courtroom identification.[2]

During their respective cross-examinations, both Gelestino and Pelander were asked to view Sandra Reed, who later testified that she was Lee's girl friend, and Lee himself. Both men positively identified Ms. Reed as the Georgetown thief's confederate, and Pelander also testified that she was the woman who was in the Wheaton store at the time of the second sighting. Contrary to the routine denouements which so often add spice to Perry Mason episodes, however, each witness stated with certainty that Lee was not the man who stole the compact discs. In so doing, Gelestino and Pelander dealt a shattering blow to the defense that Lee did it, but (ironically) strengthened Wilson's position on the Fifth Amendment issue raised in this appeal.

Wilson presented defenses of misidentification and alibi, and contended that Lee was the real perpetrator. The defense evidence consisted mainly of the testimony of three witnesses.[3] Wilson's supervisor testified that Wilson was employed as a truck driver for Walter Reed Army Medical Center. According to a time ledger which was entered into evidence, Wilson worked for eight hours on the day of the second sighting. The supervisor conceded, however, that he did not personally monitor Wilson's movements and that he could only assume that Wilson was present throughout the day.

Wilson testified that he had not been in Georgetown for about ten years, and was certainly not there on the day of the crime. He also stated that he considered Lee a friend and that he knew Ms. Reed, Lee's girl friend. He claimed that he had lent Lee his car to use during the week of the second sighting. Wilson also denied ever having visited the Penguin Feather Record Shop in Wheaton. He testified that he did not own a green and yellow reversible jacket.

A defense investigator testified in Wilson's behalf concerning his interviews with Lee. During one of these discussions, Lee told the investigator that he had occasionally borrowed Wilson's car, but could not recall the dates on which he had done so. The investigator also identified a green jacket with a tan lining produced by Lee in response to a subpoena *duces tecum* as similar to the coat which Lee was wearing during an interview. The investigator conceded, however, that the lining did not look yellow, a fact which Pelander confirmed on rebuttal.

## II

### THE JUDGE'S RULING

Although Wilson sought to present Lee as a witness, he was unable to secure his testimony because Lee invoked his Fifth Amendment privilege against self-incrimination. During a discussion of preliminary matters prior to the start of the trial, defense counsel recommended to the court that an attorney be appointed for Lee to advise him with respect to the privilege. Explaining the defense theory that Gelestino and Pelander had misidentified Wilson and that Lee was actually the perpetrator, defense counsel advised the court that she intended to ask the government witnesses to identify Lee and Ms. Reed during her cross-examination of the government witnesses. She also proposed to call Lee and Ms. Reed as defense witnesses.

At the court's request, defense counsel proffered her proposed inquiries to Lee which might trigger a Fifth Amendment problem. These questions concerned

---

**2.** Both Pelander and Gelestino testified that they recognized Wilson when he was seated in the crowded courtroom together with other persons waiting for their cases to be called. Pelander also volunteered that he had seen both Wilson and Lee in his store on previous occasions, a fact which suggests that his identification may have been more reliable than a "proverbially untrustworthy" identification by a stranger. *See* F. Frankfurter, The Case Of Sacco And Vanzetti 30 (1927), quoted in *Watkins v. Sowders,* 449 U.S. 341, 351, 101 S.Ct. 654, 660, 66 L.Ed.2d

549 (1981) (dissenting opinion).

**3.** A fourth witness, Ms. Reed, who was incarcerated at the time, testified only that she was Lee's girl friend. Defense counsel successfully objected to the prosecutor's attempt to question her as to the theft or second sighting as beyond the scope of direct examination.

whether, when, and for what purpose, Lee had borrowed and used Wilson's car in the past; whether Lee possessed a jacket matching the description of the clothing worn by the thief; and whether Lee's girl friend, Sandra Reed, matched the description given by the prosecution witnesses of the suspect's female accomplice. Defense counsel also represented that in addition to the foregoing, she proposed to ask Lee about "the ultimate issue."

To resolve the problem presented by defense counsel, the trial judge appointed an attorney for Lee. After consulting with Wilson's counsel and the witness, the attorney advised the court that given the defense theory, Lee's potential testimony raised substantial Fifth Amendment problems, and that Lee would therefore decline to testify without a grant of immunity. In response to a question by the trial judge, and after checking with her superiors, the prosecutor indicated that the government would not offer immunity and would not represent that Lee would not be prosecuted.

The judge decided to defer her ruling with respect to whether she would permit in-court identification of Lee and Ms. Reed until after she had ruled on Lee's assertion of his Fifth Amendment privilege.[4] Thereafter, the judge conducted a *voir dire* examination of Lee in which she informed him of defense counsel's proposed line of inquiry and asked him whether he would be prepared to respond to the contemplated questions. On the advice of counsel, Lee invoked his privilege against self-incrimination and declined to testify. The court then ruled as follows:

> [T]he appointed attorney for Mr. Lee indicated and obviously has advised her client that in her view he had a Fifth

Amendment right [with respect] to all the questions since the purpose of the defense in having this testimony was to incriminate him, and that's the sole purpose of having him testify....

[G]iven [Lee's attorney's] proffer and the short hearing that we've just had where Mr. Lee has indicated that he would assert his Fifth Amendment right to the questions that [defense counsel] ... was going to propound and the clear Fifth Amendment implications, I've determined that Mr. Lee has a legitimate Fifth Amendment right to refuse to testify as to these questions since, as I've indicated, the sole purpose of putting [him] on is to have him testify, is to have him confess to the crime, and/or incriminate himself.

So even if he's not guilty of the crime, since the sole purpose is to incriminate him, even an admission that he might have ... borrowed the car during the period, for instance, during the pertinent time period would incriminate him.

So I'm satisfied that he's entitled to assert the privilege, that the testimony would be incriminatory, and that there would be a risk—the risk of prosecution would be real and substantial and not fanciful.

And that based on the *Roscoe Jackson* case decided March 29th[5] that in this case a—more elaborate hearing beyond what I have already done is not necessary.[6]

## III

### LEGAL DISCUSSION

#### A. *General Considerations*

His hopes that the government witnesses would withdraw their identifications of him

---

4. Defense counsel objected to the postponement of these decisions and asked that they be made immediately, so that counsel could determine what she might properly include in her opening statement.

5. *Jackson v. United States,* 490 A.2d 192 (D.C. 1985).

6. The judge did rule in Wilson's favor on other issues. Over the prosecutor's objection, she per-

mitted defense counsel to conduct the in-court show-up proceedings at which Lee and Ms. Reed were shown to the prosecution witnesses. She also ordered Lee to produce his green jacket. Lee having declined to testify, the judge ruled that he was "unavailable" and admitted the defense investigator's testimony as to statements Lee made during several interviews, primarily about having borrowed Wilson's car and about Ms. Reed being his girl friend.

upon viewing Lee having been crushed in dramatic fashion by Gelestino and Pelander in open court, Wilson was convicted of TPWR. His appeal requires us to address two competing constitutional claims, both central to our system of justice.

Wilson seeks to vindicate his right, under the Sixth Amendment, to call witnesses in his own defense. This right is an essential attribute of our adversarial system, fundamental to a fair trial, and basic to the due process of law. *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 651–53, 98 L.Ed.2d 798 (1988); *King v. United States,* 550 A.2d 348, 353 (D.C.1988). Lee, on the other hand, relied during trial on the Fifth Amendment's declaration that "no person ... shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination was created in reaction to certain historical practices (such as ecclesiastical inquisitions and the Star Chamber) which placed a premium on compelling suspects to admit guilt from their own lips, and it is considered one of the most important constitutional protections inherited from the common law. *See Michigan v. Tucker,* 417 U.S. 433, 440, 94 S.Ct. 2357, 2361, 41 L.Ed.2d 182 (1974); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

■ We turn first to a general consideration of the legal principles which apply where the two amendments come into apparent conflict. In the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify. *King v. United States, supra,* 550 A.2d at 353; *In re Willie,* 25 Fed.Cas. 38 (Cir.Ct.D.Va.1807) (Marshall, C.J.) (trial of Aaron Burr). This result is compelled by reason as well as by authority, for no man may vindicate his constitutional rights by requiring another to forego his own. *Cf. Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Because both rights are so precious, however, and because a forced election between them is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision. When the protections of the two amendments come into conflict, the court must attempt to preserve them both to a reasonable extent. *Mason v. United States,* 244 U.S. 362, 364, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917); *In re Willie, supra; Jaggers v. United States,* 482 A.2d 786, 793 (D.C.1984) (*per curiam* ).

Frequently, as in this case, the conflict arises out of the government's refusal to provide immunity or an informal promise not to prosecute to an individual who, from a common sense perspective, appears unlikely to be prosecuted in the normal course of events.[7] As the court remarked in *United States v. Herman,* 589 F.2d 1191, 1203 (3d Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979), there is often a tendency on the part of the executive branch to exercise its discretion to grant or deny immunity in ways that make it more likely that defendants will be convicted. *See also Government of Virgin Islands v. Smith,* 615 F.2d 964, 968 (3d Cir.1980).[8] In such a situation, this court has suggested that the trial judge seek a commitment from the appropriate prosecuting authority not to bring charges against the witness. *Davis v. United States,* 482 A.2d 783, 785 (D.C.1984); *see also Jaggers, supra,* 482 A.2d at 797 (concurring opinion).[9] In the present case, the trial judge

---

**7.** In the present case, a prosecution of Lee after both eyewitnesses had identified Wilson would surely have been unusual. The potential impact on Wilson of the refusal of immunity, on the other hand, was substantial. If Lee had admitted using Wilson's car at the time of the second sighting, the government's case might have suffered a mortal wound.

**8.** There is a measure of incongruity in the government's assuring the court of Wilson's guilt beyond a reasonable doubt and still insisting that the government might yet claim that the thief was not Wilson but Lee.

**9.** The approach in *Davis* and in the concurring opinion in *Jaggers* contemplates a course of action by the trial judge which is more moderate than the doctrine espoused by one federal appellate court. *See Government of Virgin Islands v. Smith, supra,* 615 F.2d at 966 (where government denies defense witness immunity with the intent to distort the judicial fact finding process, the court has remedial authority to order acquittal unless on retrial the government

made an inquiry to the prosecutor as to whether a commitment not to prosecute would be made, and Wilson makes no complaint on appeal that this was insufficient.[10]

Where, as here, no promise of immunity is forthcoming, the trial judge must undertake a searching inquiry to determine whether the testimony sought to be elicited would in fact be incriminatory and, if so, whether the risk of prosecution is real and substantial. *Jaggers, supra,* 482 A.2d at 793; *Zicarelli v. New Jersey State Comm. of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972). It is the responsibility of the trial judge, not of the witness, to determine whether the privilege has been properly invoked. *Hoffman v. United States,* 341 U.S. 479, 485–87, 71 S.Ct. 814, 817–18, 95 L.Ed. 1118 (1951); *Jaggers, supra,* 482 A.2d at 792.

The Fifth Amendment's protections are to be liberally construed, *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818, and a witness' attempt to avail himself of them should not be approached grudgingly or parsimoniously. The privilege extends beyond answers that would in themselves support a conviction to those which would furnish a link in the chain of evidence against the witness. *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818; *In re Willie, supra; Jackson v. United States,* 490 A.2d 192, 195 (D.C.1985). Moreover, a witness need not overtly prove the danger of self-incrimination, for it would be paradoxical and improper to require him to incriminate himself in order to invoke the privilege. *Davis, supra,* 482 A.2d at 785; *see Mason, supra,* 244 U.S. at 365, 37 S.Ct. at 622. To put the proposition in more concrete terms, Lee need not first admit that he purloined the discs in order to establish his right not to incriminate himself.

The judge's role in determining from the totality of the circumstances whether the privilege was properly invoked is not to be performed by rote, for it is a meaningful one. *See Davis, supra,* 482 A.2d at 785. The constitutional protection against self-incrimination is confined to real dangers, and does not extend to remote possibilities out of the ordinary course of law. *Heike v. United States,* 227 U.S. 131, 144, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913); *Jaggers, supra,* 482 A.2d at 791. If a mere imaginary possibility of danger, however attenuated, were sufficient to withhold evidence essential to the ends of justice, a salutary constitutional protection would be converted into a means of abuse. *Mason, supra,* 244 U.S. at 364–66, 37 S.Ct. at 622; *Jaggers, supra,* 482 A.2d at 792. Although, as we have noted, any answer that would provide a link in the chain of evidence is within the privilege, protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818; *Davis, supra,* 482 A.2d at 785. Where a witness might legally be prosecuted, but the threat of prosecution is not "real or appreciable," this court has held that the privilege may not properly be invoked. *In re Neal,* 475 A.2d 390, 392 (D.C. 1984) *(per curiam).* Finally, a witness may not assert a blanket privilege where a narrower assertion will suffice to protect his rights.

### B. Sufficiency of the Inquiry

Wilson contends that the trial judge failed to conduct a sufficient inquiry before ruling on invocation of the Fifth Amendment. We do not agree.

Although a criminal defendant has the absolute right not to testify, a witness may invoke the privilege only as to those specific questions to which his answers would incriminate him. *Vaughn v. United States,* 364 A.2d 1187, 1189 (D.C.

grants immunity). Our cases, which predate the bold initiatives of the Court of Appeals for the Third Circuit in this area, are to the contrary. *Terrell v. United States,* 294 A.2d 860 (D.C.1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1973); *In re J.W.Y.,* 363 A.2d 674, 684 (D.C.1976).

10. *Davis* contemplates the trial judge "seeking" the prosecutor's agreement not to prosecute, 482 A.2d at 785; the *Jaggers* concurrence speaks of "requesting" such an agreement. 482 A.2d at 797.

1976); *(Gene) Reese v. United States,* 467 A.2d 152, 157 (D.C.1983); *United States v. (Thomas E.) Reese,* 183 U.S.App.D.C. 1, 6, 561 F.2d 894, 899 (1977). When a Fifth Amendment claim is asserted by someone other than a defendant, the court must ordinarily permit examination of the witness (out of the presence of the jury in a jury trial) and rule on the claim of privilege one question at a time. *Davis, supra,* 482 A.2d at 785.

In the present case, however, the sole purpose of defense counsel's proposed inquiry was to prove that Wilson did not do it, Lee did. Every potential question was directed to that end. Only one of the two men stole the compact discs. Any answer that tended to make it less likely that Wilson was the thief would necessarily have a corresponding tendency to inculpate Lee.

When it is evident to the court from all of the circumstances that anything less than a blanket privilege will not protect the witness, then it is unnecessary to require him to invoke the privilege question by question. *Jackson, supra,* 490 A.2d at 196. At the time the trial judge made her ruling in this case, Wilson could still be acquitted. No one could anticipate whether the government witnesses would identify Lee as the thief when confronted with him in the courtroom. The potential for incrimination was obvious, and no question by question inquiry was required.

## C. *Danger of Prosecution*

■ Wilson also argues that the danger of Lee being prosecuted on the basis of his answers to defense counsel's questions was illusory, and that if such a risk existed at all, a narrower privilege would have sufficed. This contention might have some force if it had been made after cross-examination of Gelestino and Pelander, but is not persuasive given the timing of the claim in the trial court.

Of the areas of inquiry which defense counsel proposed to address with Lee (*see* p. 1138, *supra*), only two remain relevant; the ultimate issue whether Lee was the

thief, and the circumstances under which he borrowed Wilson's car.[11] Questioning Lee about the ultimate issue necessarily calls for an incriminatory response. *See In re Morganroth,* 718 F.2d 161, 167 (6th Cir. 1983); *In re Boiardo,* 34 N.J. 599, 603–05, 170 A.2d 816, 819 (1961). Moreover, if Lee had admitted his guilt, the risk of prosecution would be "substantial and real." *See Jaggers, supra,* 482 A.2d at 793. Even though the government witnesses did not identify Lee as the thief, that alone would not dissipate the danger of prosecution. Identification of Lee by the witnesses would not have been necessary to permit prosecution of Lee based upon his own incriminating testimony. If Lee confessed to the crime, the testimony of government witnesses establishing its commission would have provided adequate corroboration. *See Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). Under the circumstances, the court's conclusion that Lee had the right not to answer questions about the ultimate issue was correct.

Questions concerning Lee's use of Wilson's car raise different issues. Testimony that Lee was using the vehicle at the time of the second sighting would obviously have been helpful to Wilson's defense, and perhaps dispositive. If Lee had testified that it was he and not Wilson who accompanied Ms. Reed to the Wheaton store, the prosecution would have sustained a serious setback. Pelander's identification of Wilson was predicated on the proposition that the same man who committed the crime was the subject of the second sighting. If Lee was the man who came to the Wheaton store, then the basis for contending that Wilson was the thief in Georgetown becomes tenuous. Moreover, no crime was committed in Wheaton, so that Lee would not have incriminated himself as directly by acknowledging being there on July 17 as he would have by placing himself on the scene in Georgetown.

But here, as in many of life's activities, timing is everything. When Judge Kotelly

---

**11.** The judge required Lee to produce his green coat, which was admitted into evidence. It was also established through other evidence that Ms. Reed was Lee's girl friend.

sustained the privilege, it was still defense counsel's strategy to attempt to obtain identifications of Lee by Pelander and Gelestino as the real culprit in the case. If these witnesses had testified as the defense hoped, this would have exculpated Wilson and almost certainly led to his acquittal. Lee would then have been in considerable trouble. An admission that he was the man whom Pelander saw at the Wheaton store would have compounded his anguish and made his position even more precarious. The possibility of prosecution would then surely have been real and substantial.

### D. *Events After the Ruling* ·

█ The prospect that Lee might be prosecuted for the theft of the discs diminished after both Gelestino and Pelander testified unequivocally, after observing him, that he was not the thief. Thereafter, even if Lee had acknowledged being in possession of Wilson's car at the time of the second sighting, the difficulties in prosecuting him would arguably have been sufficiently formidable to remove any reasonable cause to apprehend prosecution. *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818; *Davis, supra,* 482 A.2d at 785. In any event, we think it fair to say that after the courtroom show-ups, the Fifth Amendment issue became much closer with respect to those proposed questions which were not directed to the ultimate issue. Seizing on this post-ruling change in circumstances, Wilson asks us to reverse his conviction because, he contends, the threat that Lee would have been prosecuted had been substantially dissipated after the government witnesses had exculpated Lee. He suggests that it was error for the judge not to revisit her prior decision even though she was not requested to do so.[12]

In the present case, however, Wilson's counsel in fact pressed for an early decision. Prior to the commencement of trial,

she argued that "it would be important for opening statements to know what either is or is not coming in." The judge deferred ruling overnight to enable Lee to consult with counsel, and eventually made her ruling at a time which was considerably later than counsel requested. After the judge sustained Lee's Fifth Amendment claim, the defense never raised the issue again. The record does not disclose whether this was an oversight in the heat of battle or a tactical decision. The latter is a distinct possibility, however, for after Gelestino and Pelander had dashed Wilson's hopes by ruling out Lee as the culprit, counsel may well have concluded that Lee, if compelled to testify, might rub more salt into Wilson's wounds, and that the risk of calling him was too great.

In any event, the trial judge was not asked to modify, on the basis of supervening events, a decision which we have found to have been correct when made. That she did not do so on her own initiative is therefore reviewable only for "plain error." Any error must be shown to be an "egregious" one, *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), which jeopardizes the fairness and integrity of Wilson's trial. *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (*en banc*). On these facts, we discern neither error nor plain error.

For the foregoing reasons, Wilson's conviction is hereby *Affirmed.*

---

**12.** If the judge had initially been asked to delay her ruling until after the government case, this might have produced a more informed determination as to whether Lee faced an appreciable danger of prosecution rather than merely an imaginary one. *See In re Neal, supra,* 475 A.2d at 392. It may sometimes be in the interest of justice for the trial judge to defer ruling on an

issue of this kind until a stage of the trial at which all potentially relevant information has been received, *cf. Graves v. United States,* 515 A.2d 1136, 1142 (D.C.1986) and *Thompson v. United States,* 546 A.2d 414, 423–24 (D.C.1988), provided that such deferral does not result in the parties being unprepared to proceed.