Johnny W. LITTLEJOHN, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–150.

District of Columbia Court of Appeals.

Argued March 4, 1997.
Decided Oct. 2, 1997.

Betty J. Clark, Washington, DC, appointed by the court, for appellant.

Marian L. Borum, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Gina L. Simms, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

Johnny W. Littlejohn was convicted by a jury of three weapons offenses[1] arising out of his possession, on May 3, 1993, of a loaded semi-automatic pistol. On appeal, he contends that the trial judge erroneously sustained the invocation by a prospective defense witness, Leonard Bishop, of Bishop's privilege against self-incrimination. Littlejohn claims that the judge's ruling impaired his right under the Sixth Amendment to present witnesses in his defense. We agree and reverse.

## I.

### THE EVIDENCE

The trial in this case began on June 20, 1995, more than two years after the events that led to Littlejohn's indictment. The prosecution sought to establish, through the testimony of two police officers, that Littlejohn was in possession of a loaded pistol. The defense proposed to call Leonard Bishop to testify that Littlejohn did not have a pistol. After the judge sustained Bishop's assertion of privilege, however, the defense rested without presenting any evidence.

Officer Efrain Soto, then a 5-year veteran of the Metropolitan Police Department, testified that on the evening of May 3, 1993, he and two other officers, Investigators Edward Howard and Kevin Marable, were on patrol in an unmarked police cruiser in the 600

block of 46th Place, S.E. in Washington, D.C. The area was known for a high volume of drug trafficking and, according to Soto, the officers were "out there looking for drugs." Officer Howard, the senior investigator, was driving. Officer Soto was in the front passenger seat.

Soto testified that as the officers were patrolling, Investigator Howard pointed out a man, later identified as Littlejohn, and told Soto and Marable that "he's got a gun."[2] Officer Soto saw Littlejohn grab his waist and start running towards a wooded area. Soto stepped out of the cruiser and drew his service revolver. Holding the weapon in his right hand and a flashlight in his left, Soto began a lengthy pursuit of Littlejohn. Investigator Marable joined the chase, but stumbled as he ran and fell some distance behind Soto.

Seeking to elude the officers, Littlejohn ran through a hole in a fence. Near the fence, Littlejohn stumbled to the ground. Officer Soto, who was some fifteen feet behind Littlejohn at the time Littlejohn went down, testified that he saw an object which he believed to be a pistol fall from Littlejohn's waist. Identifying himself as a police officer, Soto ordered Littlejohn to stop. Littlejohn, however, ignored the order and got up and continued to run. Officer Soto maintained his pursuit until he finally apprehended Littlejohn some distance away in the 4700 block of Benning Road. Soto estimated that the chase lasted four or five minutes.

When Investigator Marable arrived at the location where Littlejohn had been captured, Soto placed his prisoner in Marable's custody. Soto then returned to the area of the fence near which Littlejohn had fallen to the ground. Soto testified that he immediately found the pistol that Littlejohn had dropped. The weapon was loaded.

---

1. D.C.Code § 22–3204(a) (1996) (carrying a pistol without a license); § 6–2311(a) (1995) (possession of an unregistered firearm); and § 6–2361(3) (1995) (unlawful possession of ammunition).

2. Littlejohn's attorney objected to Soto's testimony regarding what Howard said. The judge

overruled the objection and stated that the evidence was "only admitted for the reason why Officer Soto looked toward the defendant." Although he did not specifically say so, the judge obviously meant that the jury should not consider Howard's out-of-court statement for its truth.

On cross-examination, Officer Soto was asked whether he had told anybody that he had recovered the pistol from under Littlejohn's body at the time that Littlejohn fell down. Soto responded that "[t]hat never happened. I never told any officer that."

Investigator Marable, like Officer Soto, was a 5–year veteran of the MPD. On direct examination, he substantially corroborated Soto's account of the relevant events. Marable acknowledged that he did not see Littlejohn place the weapon in his waist, and that he likewise did not see the weapon fall from Littlejohn's possession during the chase. He stated, on the contrary, that he first saw the pistol after Soto had recovered it from a wooded area.

On cross-examination, Investigator Marable testified that he had prepared the paperwork relating to Littlejohn's arrest. He acknowledged that he had been trained to pay particular attention to accuracy in the preparation of police reports. Marable was then confronted with the Form PD 163 (the prosecution report) which he had signed shortly after the incident, and with the "Gerstein proffer,"[3] a document used by prosecutors to establish probable cause at the defendant's initial appearance before the court following his arrest. On the Form PD 163, Marable wrote that "[a]fter a short foot chase,[4] the defendant fell to the ground and placed the handgun on the ground." In the Gerstein proffer, Investigator Marable stated that the handgun was "recovered under the defendant's body before he fell." Marable conceded that notwithstanding the importance of assuring accuracy in police documents, his contemporaneous accounts of the events of May 3, 1993 were not accurate. This testimony led to the following exchange:

Q. Are you telling us that your memory is better now than the day after it happened?

A. Yes, sir.

Q. Actually, the 163 was prepared on the evening of May 3rd, wasn't it?

A. Yes, sir.

Marable attributed the inaccuracies in the paper work to "me miswording the 163."

At the conclusion of the government's case, Littlejohn's counsel made an oral motion for a judgment of acquittal (MJOA). The trial judge denied the motion.

## II.

## BISHOP'S INVOCATION OF THE PRIVILEGE

At the beginning of the trial, during jury selection, Littlejohn's attorney told the members of the venire that he might call Leonard Bishop, aged about 20–25, as a defense witness. He stated that Bishop lived on 46th Place, S.E. Soon thereafter, in his opening statement, the defense attorney told the jury that

> you will hear from a gentleman who was with Mr. Littlejohn. He didn't see Mr. Littlejohn put a gun into his waistband, and he didn't see Mr. Littlejohn with a gun that evening.

After he had denied Littlejohn's MJOA, the judge inquired regarding the defense case. Littlejohn's attorney announced that his first witness would be Leonard Bishop, and the judge asked what counsel expected Bishop's testimony to be. Counsel responded that Bishop would "in essence say, your honor, that Mr. Littlejohn was out in the circle that evening and he did not have a gun."

The judge asked the prosecutor whether the government had "anything that could conceivably tie Mr. Bishop to any criminal activity including the gun charge in this case." The prosecutor responded: "No. That's my preliminary answer."[5] The matter was deferred, however, until the court

---

3. *See Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

4. The officer's description of the foot chase as "short" invites comparison with his testimony at trial that "Mr. Littlejohn fell from what I believe was exhaustion and I fell right next to him be-

cause I was totally out of breath and everything else."

5. The prosecutor declined to make a commitment that Bishop would not be prosecuted if he testified to any facts that would render him subject to prosecution.

could hear from Bishop and Bishop's attorney, Anthony Matthews, Esquire.

When the case was re-called, Mr. Matthews advised the court that Bishop had been charged with a murder which took place in the 600 block of 46th Place, S.E. on November 25, 1994, a year and a half after the present case arose. The judge commented that "I don't see a Fifth Amendment problem based upon that at all. That's for sure." Bishop's attorney stated, however, that "the problem is it puts Mr. Bishop in that area and it suggests that he hangs out on the scene." According to Mr. Matthews, the government would attempt to prove at Bishop's forthcoming trial that "Mr. Bishop is part of something called 'Simple City Crew,' a crew that deals drugs." He explained that he did not want any testimony by Bishop to help the government "to hook my client up with some crew who deals drugs there...." The trial judge stated that he could "see a possible concern if it's the defense position that Mr. Bishop never is in the vicinity of the 600 block of 46th Place, S.E."

The judge asked the prosecutor whether she wished to say anything about the general nature of her proposed cross-examination of Bishop if Bishop took the stand. The prosecutor stated that "I'm going to probe primarily for issues of bias, but I'm not going to, at this juncture, promise not to ask him about things like how long he was out there that night, what he was doing that night." She also expected to ask Bishop how he knew Littlejohn and for how long he had known him. Littlejohn's attorney asked the judge to restrict the government's cross-examination to events that happened after 10 p.m. on

May 3, 1993. The judge declined to do so, noting that the prosecutor had the right to explore the question whether "Mr. Bishop has any bias or prejudice in favor of Mr. Littlejohn."

Bishop, who was in custody, was brought to the courtroom. The judge carefully explained Bishop's rights to him, and he invited Bishop to discuss his options with his attorney. Bishop twice asked for more time to consider his decision, and the judge granted each request. Finally, Bishop stated: "All right. Gee, I'll take the Fifth."

The judge then immediately delivered his ruling:

> I don't think that there is any sort of testimony that Mr. Bishop could give that would not implicate his Fifth Amendment right so I don't think this has to be done on a question by question basis.[6] Mr. Bishop has chosen to assert his Fifth Amendment right not to testify. I find for the reasons given earlier on that he does have a Fifth Amendment right in view of the pending murder case, and anything that he might say in this case would implicate and hurt him in that case because it would tie him to the 600 block of 46th Place, Southeast, where the gun charge in this case arose and the pending murder case arose. So at this point he can step out with the marshal.

Littlejohn's attorney invited the judge's attention to the fact that Bishop had been convicted of a drug offense that was incurred in the same neighborhood a short time after Littlejohn's arrest.[7] The judge responded, without elaboration, that "[t]hat doesn't change my decision." [8]

---

6. The judge's ruling represented the first occasion in this case on which either the court or counsel addressed the issue whether a blanket invocation of the privilege against self-incrimination would be permitted, or whether Bishop would be required to claim the privilege with respect to one question at a time.

7. Littlejohn's attorney represented in his motion for a new trial that Bishop was arrested on the drug charge in the 600 block of 46th Place, S.E. on May 13, 1993, ten days after Littlejohn's arrest.

8. Littlejohn's counsel then moved for a mistrial on the ground that he had represented in his

opening statement that Bishop would testify. The judge denied this motion without comment.

The defense attorney also asked for a brief recess of the trial, noting that Bishop's own trial was scheduled for the following week. Counsel's evident point was that after the trial, Bishop could testify on Littlejohn's behalf without incriminating himself. The judge denied this motion without comment. Littlejohn has not raised the denial of the continuance as a ground for reversal of his convictions. Cf. *Martin v. United States*, 606 A.2d 120, 127–32 (D.C.1991).

Bishop was subsequently convicted of premeditated murder while armed and several other offenses, and his appeal is now pending in this court. *Bishop v. United States*, No. 96–CF–1095.

In light of the judge's ruling, the defense was unable to call Bishop as a witness. Littlejohn decided not to take the stand, and the defense rested without presenting any evidence. The jury convicted Littlejohn of all three charges against him. Littlejohn's trial counsel filed a comprehensive written motion for a new trial, which the court denied. Littlejohn was duly sentenced, and this appeal followed.

## II.

### LEGAL DISCUSSION

#### A. *Standard of review.*

 Our review of a trial judge's decision authorizing a defense witness' invocation of the privilege against self-incrimination may implicate questions both of fact and of law. As in other comparable situations, we accord deference to the trial judge's findings of historical fact and to his first-hand assessment of the realities of the situation before him. *See, e.g., Griffin v. United States,* 618 A.2d 114, 117–18 (D.C.1992); D.C.Code § 17–305(a) (1997). We apply the non-deferential *de novo* standard, on the other hand, to the judge's conclusions of law. *Guadalupe v. United States,* 585 A.2d 1348, 1352 n. 7 (D.C. 1991). In reviewing the trial court's resolution of a mixed question of fact and law, we consider, among other things, whether the issue to be decided more closely resembles one of fact or of law, and whether the trial court or the appellate court is in a better position to render the decision with the higher degree of accuracy. *United States v. Felder,* 548 A.2d 57, 61–64 (D.C.1988).

 In the present case, the facts of record relating to Bishop's invocation of the

privilege are largely undisputed, and the issue before us is predominantly one of law. Moreover,

> [t]he balance we strike between the competing interests will not only have consequences for the parties here, but will also provide legal precedent affecting the rights of future litigants. This is a significant reason for *de novo* review.

*Griffin, supra,* 618 A.2d at 118 (citations omitted). A "more searching" standard of review may also be warranted where, as here, basic constitutional liberties are implicated. *Id.; see also Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–30, 10 L.Ed.2d 726 (1963).[9] On the specific facts before us, we review *de novo* the judge's disposition of Bishop's Fifth Amendment claim.

#### B. *The Fifth and Sixth Amendments.*

 Littlejohn's right to call witnesses in his own defense is an essential attribute of our adversarial system, fundamental to a fair trial, and basic to due process of law. *Taylor v. Illinois,* 484 U.S. 400, 407–09, 108 S.Ct. 646, 652–53, 98 L.Ed.2d 798 (1988); *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C. 1989). A criminal trial at which the defendant is unable to present relevant testimony tending to show that he is innocent is haunted by the spectre of unfairness and the appearance thereof.

 The right to call witnesses, however, is not absolute. "[N]o man may vindicate his constitutional rights by requiring another to forego his own." *Wilson, supra,* 558 A.2d at 1140 (citation omitted). This court recently reiterated en banc that

9. The foregoing approach to the standard of review is consistent with that taken by a division of this court in *Carter v. United States,* 643 A.2d 348, 356 (D.C.1994) (*Carter I*). *Carter I* was recently vacated on other grounds by the full court. *See Carter v. United States,* 684 A.2d 331 (D.C.1996) (en banc) (*Carter II*). *Carter I* is thus without formal precedential significance. We note, however, that *Carter II* is not at all inconsistent with *Carter I*'s articulation of the standard of review.

Essentially for the reasons stated by the division in *Carter I,* we do not agree with the view of some courts that the judge's disposition of a

witness' assertion of his Fifth Amendment privilege is reviewable only for abuse of discretion. If the risk of self-incrimination is real, then, consistent with the Fifth Amendment, the judge *must* sustain the invocation of the privilege; if the risk is imaginary, then, in conformity with the Sixth Amendment, the judge *must* reject the claim and compel the witness to testify. *Carter I, supra,* 643 A.2d at 355. "In making [the relevant] inquiry, the judge is, in our view, confronted with identifiable questions of law and fact, and not with a discretionary choice between permissible alternatives." *Id.*

a criminal defendant's right to present witnesses in his own defense is a fundamental one. *Wilson v. United States, [supra],* 558 A.2d [at] 1140. Nevertheless, "in the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Id.* "Because both rights are so precious ... and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision." *Id.* *Carter II, supra,* 684 A.2d at 336 (quoting *Harris v. United States,* 614 A.2d 1277, 1281–82 (D.C.1992)). "When the protections of the two amendments come into conflict, the court must attempt to preserve them both to a reasonable extent." *Wilson, supra,* 558 A.2d at 1140 (citing, *inter alia, In re Willie,* 25 Fed. Cas. 38 (Cir.Ct.D.Va.1807) (Marshall, C.J.) (trial of Aaron Burr); *Mason v. United States,* 244 U.S. 362, 364, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917) (quoting *In re Willie* )).

 In the present case, Bishop was not the defendant but a prospective witness.[10] "The [Fifth Amendment] privilege of a witness is narrower than that of a defendant, and extends only to specific questions; it does not encompass a refusal to take the stand at all." *Harris, supra,* 614 A.2d at 1282; *see also Collins v. United States,* 596 A.2d 489, 491 (D.C.1991). "Although a criminal defendant has the absolute right not to testify, a witness may invoke the privilege only as to those specific questions to which his answers would incriminate him." *Wilson, supra,* 558 A.2d at 1141 (citations omitted). "[A] witness does not have the broader Fifth Amendment right that an accused does to decline even to take the stand." *In re D.R.,* 673 A.2d 1259, 1262 (D.C.1996) (citations omitted). "Accordingly, when a Fifth Amendment claim is asserted by someone other than the defendant, the court must ordinarily permit examination of the witness (out of the presence of the jury in a jury trial) and rule on the claim of privilege one

question at a time." *Harris, supra,* 614 A.2d at 1282 (citations omitted). A blanket privilege may be granted to the witness only when it is evident to the court that anything less will not adequately protect him. *Wilson, supra,* 558 A.2d at 1142; *Jackson v. United States,* 490 A.2d 192, 196 (D.C.1985).

 "The privilege [against self-incrimination] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (citation omitted).[11] It must be "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness [seeking to invoke the privilege] is mistaken, and that the answer[s] cannot possibly have [a] tendency to incriminate." *Id.* at 488, 71 S.Ct. at 819 (citation and internal quotation marks omitted). The Fifth Amendment "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).

 This protection must, however, "be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818 (citations omitted). The privilege against self-incrimination "is confined to real danger and does not extend to remote possibilities out of the ordinary course of law." *Heike v. United States,* 227 U.S. 131, 144, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913); *see also Wilson, supra,* 558 A.2d at 1141. "[I]t would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice." *Mason, supra,* 244 U.S. at 366, 37 S.Ct. at 622

---

**10.** The government has not argued that because Bishop was under indictment in a separate case, he should be treated in this case as a defendant rather than as a witness.

**11.** Although in *Hoffman,* the Court was dealing with a federal crime, the same analysis applies to District of Columbia offenses. *See Wilson, supra,* 558 A.2d at 1141 (citing *Hoffman* ).

(quoting *The Queen v. Boyes,* 1 B. & S. 311, 329–30 (1861) (Cockburn, J.)).

## C. *The danger of self-incrimination—Bishop's presence in the area.*

■■■ The judge's ruling that Bishop would not be required to take the stand was apparently predicated solely on the claim by Bishop's attorney that any admission by Bishop that he was present in the 600 block of 46th Place, S.E. at any time, no matter how remote, would tend to "tie him" to the block where the murder was allegedly committed, and would thus tend to incriminate him. In reality, however, Bishop *lived on* 46th Place, S.E.,[12] and his presence in the vicinity of his home, many months before the homicide for which he was being prosecuted, could not any more constitute evidence of guilt than the easily proven fact that he lived in that vicinity. Particularly in light of Bishop's arrest on the block in question ten days *after* the date of Littlejohn's alleged offense, we conclude that this record presents only "a mere imaginary possibility of danger," *Mason, supra,* 244 U.S. at 366, 37 S.Ct. at 622 insufficient to warrant the curtailment of Littlejohn's right to present witnesses in his own defense.

The murder with which Bishop was charged was allegedly committed on November 25, 1994. Bishop's proffered testimony in the *Littlejohn* case would have placed him in the block in question on May 3, 1993, more than eighteen months earlier. There was no suggestion that on May 3, 1993, Bishop did anything unlawful. It is difficult to understand how Bishop's presence at the 600 block of 46th Place, S.E., near his home, more than a year and a half before the murder of which he was accused, could have appreciably affected a determination of his guilt or innocence.

During his discussion with the attorneys, the judge believed that a possible concern might arise if it was the defense position at Bishop's trial that Bishop was *never* in the 600 block of 46th Place, S.E. Assuming that this concern was valid on a theoretical level, the record undermines it. Counsel for Littlejohn proffered to the court that Bishop had committed a drug offense in the 600 block of 46th Place, S.E. shortly after May 3, 1993, and that Bishop's presence there was a matter of public record. Without awaiting the details of counsel's proffer, the judge ruled that this information "doesn't change my decision."

It appears from Littlejohn's motion for a new trial that Bishop's drug offense was committed on May 13, 1993. The government has not denied this allegation. If the prosecution were able to prove in Bishop's case that the defendant was in the area eighteen months and eleven days before the alleged murder, then the danger that Bishop would be incriminated by admitting that he was also there eighteen months and twenty-one days before the offense was "remote and speculative" rather than "real and substantial." *Zicarelli v. New Jersey Investigation Comm'n,* 406 U.S. 472, 478 & n. 12, 92 S.Ct. 1670, 1675 & n. 12, 32 L.Ed.2d 234 (1972).[13] We are therefore unable to agree with the trial judge's view that testimony by Bishop as to his whereabouts on May 3, 1993 would necessarily be incriminating and that a "question by question" procedure would provide insufficient protection. Moreover, if the court had proceeded one question at a time, Bishop's residence on 46th Place, which had previously been disclosed to the court during *voir dire,* would surely have re-emerged. This would probably have disposed of the claim that Bishop would incriminate himself

---

12. A map of the District of Columbia reveals that there are two separate sections of 46th Place, S.E., both very short. The two sections are approximately three blocks apart.

13. It is important to note that this court's decision in *Carter II* does not affect this analysis. We held in that case that, when evaluating a claim by a prospective defense witness that his testimony might incriminate him, the court is precluded from assessing the practical likelihood of prose-

cution; if a prosecution would be legally possible, then the witness' assertion of the privilege is in that respect sufficient. *Carter II,* 684 A.2d at 336–38. In this case, the probability of a prosecution of Bishop was not in question, for he had already been indicted, and he was awaiting trial. Rather, the question before the court was whether Bishop's disclosure that he was in the 600 block of 46th Place, S.E. on May 3, 1993 would provide a link in an incriminatory chain.

if he "tied himself" to an area in which, in fact, he lived.

D. *Bishop's potential cross-examination.*

 The foregoing analysis does not end our inquiry. "In situations of this kind, the judge must attempt to accommodate not only the interests of the witness and of the defendant, but also the right of the prosecutor to cross-examine defense witnesses." *Carter I, supra,* 643 A.2d at 353.[14] If effective cross-examination of Bishop would necessarily create an unavoidable risk of self-incrimination, then Bishop's assertion of his privilege must be sustained.

When the trial judge appropriately inquired into the subject matter of the government's proposed cross-examination, the prosecutor replied that she would attempt to impeach Bishop for bias. That impeachment could go to any bias that Bishop might have entertained either against the government or in favor of Littlejohn.

An inquiry into the first of these categories would not necessarily have required the prosecutor to pose questions to which Bishop's answers would have incriminated Bishop. The government was prosecuting Bishop for murder. It had previously prosecuted him for a drug offense. The prosecutor could reasonably urge the jury to infer that Bishop might be unfavorably inclined vis-a-vis the institution whose representatives were attempting to incarcerate him. So far as the record shows, this examination could have been conducted without requiring Bishop to admit to any potentially incriminating facts.

The question of Bishop's possible bias in favor of Littlejohn could pose more difficult problems, but they were not necessarily insurmountable. It is not readily apparent that Bishop would have incriminated himself if, in response to the prosecutor's proposed line of questioning, he acknowledged that Littlejohn was his friend, and (if true) that he

had known Littlejohn for a substantial period of time. The two men were both in their early twenties and lived in the same neighborhood.[15] If the prosecutor had attempted her impeachment by inquiries along these lines, the creation of an inference of possible partiality or bias would not have required any potentially incriminating disclosures on Bishop's part.

 It is possible, of course, that the prosecutor would have attempted to impeach Bishop by pressing him for answers that could incriminate him. If the prosecutor had *bona fide* information, for example, that Littlejohn and Bishop were both members of the same drug gang,[16] she might have attempted to suggest to the jury that protection of a confederate in crime gave Bishop a compelling motive to lie. The scope and extent of cross-examination, however, are committed to the trial court's sound discretion. *Roundtree v. United States,* 581 A.2d 315, 323 (D.C. 1990). If the government would have a reasonable opportunity to cross-examine Bishop for bias with questions not posing a threat of self-incrimination, the trial judge had the authority, and even the duty, to restrict that cross-examination to accommodate Littlejohn's Sixth Amendment rights as well. *See Carter II, supra,* 684 A.2d at 336, 342 n. 7.

As the foregoing discussion suggests, the question whether an accommodation of all of the competing interests can be reached cannot readily be answered in the abstract. It is for this reason that where a claim of self-incrimination is asserted by a witness rather than by the defendant, the court should require the witness to invoke the privilege one question at a time, and should excuse the witness from taking the stand only if absolutely necessary. *Jackson, supra,* 490 A.2d at 196. No such necessity was shown to exist in this case.

---

14. Although, as we have noted, *Carter I* is no longer binding precedent, the quoted portion of the opinion appears to have effectively survived. *See Carter II, supra,* 684 A.2d at 342 n. 7; *id.* at 350–51 (opinion of Ruiz, J.); *id.* at 356 n. 9 (dissenting opinion). In any event, the proposition that the prosecutor's interest in effective cross-examination must be included in the judge's calculus is not a controversial one.

15. Defense counsel advised the venire during *voir dire* that Littlejohn also lived on 46th Place, S.E.

16. This discussion is hypothetical; the prosecution never claimed to have any such information.

Bishop was a defendant in a murder case. Indeed, the charges against him were far more serious than those against Littlejohn, and he was facing much more time. It was surely the trial judge's obligation, under these circumstances, to take all reasonable steps within his power to protect Bishop's rights. We do not agree, however, with the judge's view that a question-by-question assertion of the privilege would not have adequately protected Bishop's interests.

## III.

## CONCLUSION

For the foregoing reasons, Littlejohn's convictions are reversed, and the case is remanded for a new trial.

██ *So ordered.*[17]

---

[17] The government apparently concedes that any error was of constitutional dimension, but contends that if there was error, it was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We do not agree. According to the defense proffer, Bishop would have testified that he was with Littlejohn on the night in question, and that Littlejohn did not have a pistol. No prosecution witness testified that he saw Littlejohn with the weapon before the chase began. Soto's testimony, two years after the fact, as to how the pistol was recovered, differed dramatically from Marable's almost contemporaneous accounts in the PD 163 and in the *Gerstein* proffer. Under these circumstances, we cannot say, with the level of assurance required by *Chapman,* that the jury would have credited Soto over Bishop if the latter had been available to testify.