IN RE KEIJAM T.■
(14699)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

498

Argued June 4—decision released July 20, 1993

*Donald D. Dakers,* special public defender, for the appellant (respondent).

*Cathleen Mulligan Edwards,* state's advocate, for the appellee (petitioner).

PETERS, C. J. The principal issue in this appeal is whether a witness may invoke his fifth amendment

right against compelled self-incrimination if principles of double jeopardy may bar his future prosecution for crimes relating to the testimony sought. The state charged the juvenile respondent, Keijam T., in a delinquency petition with the serious juvenile offense of murder in violation of General Statutes § 53a-54a[1] for intentionally causing the death of another person on August 13, 1990.[2] The trial court, *Riddle, J.,* found probable cause to believe that the respondent had committed murder as charged,[3] and transferred him to the regular criminal docket pursuant to General Statutes § 46b-127.[4] The respondent appealed this transfer order to the Appellate Court, pursuant to General Statutes §§ 46b-127, 46b-142 and 52-263,[5] claiming that the trial

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] The delinquency petition also charged the respondent with the serious juvenile offense of attempted murder in violation of General Statutes §§ 53a-54a and 53a-49, and with the offenses of criminal use of a firearm in violation of General Statutes § 53a-216, carrying a pistol without a permit in violation of General Statutes § 53-206, reckless endangerment in the first degree in violation of General Statutes § 53a-63, escape from a correctional institution in violation of General Statutes § 53a-169, and two counts of unlawful discharge of a firearm in violation of General Statutes § 53-203.

[3] This transfer hearing was the second to take place in this matter on the issue of probable cause. The new hearing was ordered by this court after an appeal by the respondent challenging the standard of probable cause applied by the trial court in the first probable cause hearing. *In re Keijam T.,* 221 Conn. 109, 602 A.2d 967 (1992).

[4] The transfer provisions of General Statutes § 46b-127 pertain to a child who has "attained the age of fourteen years." The trial court found that the respondent had been fifteen years old on the date when the serious juvenile offense of murder, with which he had been charged, was committed.

[5] General Statutes § 46b-127 provides in relevant part: "An order by the court under this section transferring a child from the docket for juvenile matters to the regular criminal docket of the superior court shall be a final judgment for purposes of appeal. . . ."

General Statutes § 46b-142 (b) provides in relevant part: "[A]ny party at interest aggrieved by any final judgment or order of the court [for juve-

court had improperly sustained a rebuttal witness' fifth amendment privilege not to testify and, thus, had violated the respondent's constitutional right to compel witnesses in his defense. We transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We now affirm.

The trial court made the following written findings pursuant to § 46b-127.[6] Between midnight and 12:30 a.m. on August 13, 1990, Tythron Blue and Moses James were walking along a sidewalk on Arthur Street, in New Haven, moving toward Rosette Street on the odd numbered side of the road. Blue was walking slightly behind James. Upon hearing "a thump" in the backyard of 23 Arthur Street, James turned and saw the respondent running out of the backyard and shooting a gun that looked like an Uzi.[7] James turned and ran toward Rosette Street; Blue hesitated, but then followed James on Arthur Street, staying nearer to the houses than James. James saw Rodney Lewis[8] in front of him on the opposite, even numbered side of the street, firing at them with a nine millimeter handgun with an eight or nine inch barrel and moving backward toward Rosette Street.

---

nile matters], may appeal to the appellate court in accordance with the provisions of section 52-263. . . ."

General Statutes § 52-263 provides in relevant part: "Upon the trial of all matters of fact in any cause or action in the superior court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial . . . he may appeal to the court having jurisdiction from the final judgment of the court or of such judge . . . ."

[6] See *In re Keijam T.*, 221 Conn. 109, 112–13, 602 A.2d 967 (1992), for a more detailed description of the facts in this case, not inconsistent with the findings made by the trial court, *Riddle, J.*, at the transfer hearing from which this appeal is taken.

[7] The court found that 99 percent of all Uzis are designed to fire a nine millimeter bullet.

[8] Rodney Lewis is the rebuttal witness whose testimony is at issue here.

James ran past three or four houses, and then turned right into an alley. As Blue followed, he turned his right side toward the respondent, who was behind them on Arthur Street. After Blue had moved a few feet into the alley, he leaned against the back of a car saying to James, "Mo, I'm shot. Mo, I'm shot." James ran through the alley to a backyard at DeWitt Street, and laid in the grass for about five minutes. When he returned to Arthur Street, James saw Blue lying in the middle of the road, bleeding. When the respondent fired two or three more shots, James ran back toward DeWitt Street. When he returned finally to Arthur Street, James found a number of girls screaming and holding Blue. Lewis then stopped firing the gun and ran back to the respondent's home.

The court found that Blue had been fatally shot on August 13, 1990, at approximately 12:30 a.m. Blue's death resulted from a medium caliber bullet that entered his right side, the trajectory of the bullet being from right to left and horizontal.

The respondent was arrested for the murder of Blue. Lewis was also arrested and charged with attempt to commit assault in the first degree and criminal use of a firearm for his conduct in the shooting incident. Lewis was not charged with murder because, comparing the relative positions from which the respondent and Lewis had been firing, the police concluded that the bullet that had struck Blue had come from the respondent's gun.

At the transfer hearing, the respondent offered Lewis as a rebuttal witness to prove that Lewis, rather than the respondent, had shot Blue and that the respondent had not been on the scene at the time of the shooting.[9] At the time that his testimony was offered, Lewis

---

[9] The respondent's offer of proof was as follows:

"[Defense counsel]: With respect to Mr. Lewis I had offered to prove that he had been present at the first shooting incident on Arthur Street

had been convicted of and was serving the sentence imposed for the crime of criminal attempt to commit assault in the first degree that arose from his participation in the shooting incident on August 13, 1990. Lewis took the stand but, before being questioned, claimed his fifth amendment privilege not to testify, on the ground that his attempted assault conviction might not bar his subsequent prosecution for other offenses arising out of the death of Blue.[10] The court ruled that "the use of the privilege by Mr. Lewis is proper because answers to the questions could provide a link in the chain of evidence and ultimately put this

---

at approximately eight o'clock on August 12, 1990. That he saw Tythron Blue, Moses James and others and that they fired shots at him at approximately eight o'clock. Then he left, got a gun and came back at approximately twelve midnight and the type of gun he had was a 357. That he was on Arthur Street near Rosette headed towards Lamberton Street and that he was on the odd side of the street. He saw Moses James, Tythron Blue and the others. They were also on the odd side of the street near Moses James' house and that they were headed towards him. That Moses James and Tythron Blue started shooting at him and he returned the fire. Once shooting started, he backed up across Arthur Street to the even side, ran through the yards to Button Street. And he ended up coming out by 2 Arthur Street where he saw the respondent sitting on the porch with the police. That he did not see the respondent outside that night. That the last time he saw him that night he was in the house before the eight o'clock shooting."

[10] Lewis' attorney stated the following: "Mr. Lewis is standing on his fifth amendment privilege . . . . I'd like to believe that his plea in part A would preclude any further prosecution concerning this particular incident with Mr. Lewis. But as his lawyer, I cannot guarantee that that would ever happen. And a judge reviewing this situation . . . could certainly take the position, although I would vigorously oppose it and disagree with it . . . that Mr. Lewis, based on new evidence, could be subject to prosecution for this homicide. And therefore, on that basis we have advised him not to answer any questions and that he should claim the fifth amendment. I certainly think the reason the plea was entered to begin with and the disposition that was given to begin with were grounded on our belief that it would conclude prosecution for the incident in its entirety. . . . He was charged with an attempted assault that had to do with the other individual involved in the case [James]. And therefore, I feel fairly confident in advising him that he has a very sound legal ground for taking the fifth amendment in this particular case . . . ."

witness at risk of possible additional prosecution." The respondent took exception, claiming that any further prosecution of Lewis would be barred by Lewis' constitutional right against double jeopardy.

The respondent's sole claim on appeal is that the trial court improperly sustained Lewis' assertion of his fifth amendment privilege not to testify at the respondent's hearing. According to the respondent, applicable principles of double jeopardy would bar Lewis' future prosecution for the murder of Blue. We disagree.[11]

A court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is " ' "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency" to incriminate.' " (Emphasis in original.) *State* v. *Williams,* 200 Conn. 310, 319, 511 A.2d 1000 (1986), quoting *Hoffman* v. *United States,* 341 U.S. 479, 488, 71 S. Ct. 814, 95 L. Ed. 1118 (1951); *State* v. *Simms,* 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S.

---

[11] Because we hold that the trial court properly sustained the witness' fifth amendment privilege against compelled self-incrimination, we need not reach the question whether, by improperly excusing a witness from testifying, the court violated the respondent's right to compel witnesses in his defense.

In his reply brief, the respondent asked this court for the first time to consider his juvenile status as a special factor so as to alter the traditional balancing of the privilege against compelled self-incrimination, under the fifth amendment to the federal constitution and article first, § 8, of the state constitution, with the right to compulsory process to produce witnesses in one's behalf, under the federal constitution and article first, § 8, of the state constitution. As a general matter, if a conflict between these rights exists, "the accused's right to compel testimony must give way to the witness' privilege against self-incrimination . . . ." *State* v. *Simms,* 170 Conn. 206, 209, 365 A.2d 821 (1976), citing *Kastigar* v. *United States,* 406 U.S. 441, 444–45, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). Because this issue is not properly before this court, nor adequately briefed, it will not be addressed.

Ct. 1732, 48 L. Ed. 2d 199 (1976). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman* v. *United States, supra,* 486–87; *State* v. *Simms, supra.* In appraising a fifth amendment claim by a witness, a judge "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." (Internal quotation marks omitted.) *State* v. *Williams, supra.*

The parties do not dispute that, in the absence of a double jeopardy bar, the testimony to be given by Lewis would be incriminating. The respondent's offer of proof regarding Lewis' testimony was that Lewis, not the respondent, had fired the shot that had killed Blue. Although Lewis would normally be able to invoke his fifth amendment privilege to avoid giving such testimony, the respondent maintains that Lewis could testify with impunity because his conviction of attempted assault triggered a double jeopardy bar against any future prosecution stemming from the shooting incident that resulted in Blue's death.

"[T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the *possibility* of prosecution." (Emphasis added.) Id. The trial court was not obligated, therefore, to reach the ultimate merits of the underlying double jeopardy claim in resolving the fifth amendment issue. Under *Williams,* the trial court was obligated to assess only whether a possibility of future prosecution existed, or could arise, by virtue of the proffered testimony in light of existing law. The trial court could consider the facts actually in evidence, and the peculiarities of the case; id.; but the court was not compelled to conduct a separate

trial to reach a definitive conclusion concerning the future availability of a defense of double jeopardy to a nonparty witness in the trial at hand.

As a matter of procedure, in sustaining Lewis' fifth amendment privilege, the trial court carefully and thoroughly addressed the considerations mandated by *Williams*. It was only after hearing argument by counsel, reviewing the memorandum submitted by the respondent's counsel, reviewing the transcripts of Lewis' plea and sentencing hearings, and considering the questions in the context of this proceeding that the court determined that any relevant inquiry addressed to Lewis could provide a link in the chain of evidence and ultimately put him at risk of possible additional prosecution.

Under *Williams*, whether Lewis could invoke his fifth amendment privilege devolves, therefore, into a substantive question of whether there was a possibility that Lewis might be subject to prosecution for Blue's murder. This question must be analyzed in light of *State v. Lonergan*, 213 Conn. 74, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 100 S. Ct. 2586, 110 L. Ed. 2d 267 (1990), which sets forth the standard for determining when double jeopardy attaches in consecutive prosecution situations in this state. The *Lonergan* test states that "in successive prosecution cases if the same evidence offered to prove a violation of the offense charged in the first prosecution is the sole evidence offered to prove an element of the offense charged in the second prosecution, then prosecution of the second offense is barred on double jeopardy grounds, regardless of whether either offense requires proof of a fact that the other does not." (Internal quotation marks omitted.) Id., 92.

Although exposure to future prosecution is more attenuated under the *Lonergan* standard than under

the standard for simultaneous prosecutions; see *Block-burger* v. *United States,* 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932);[12] *State* v. *Goldson,* 178 Conn. 422, 424, 423 A.2d 114 (1979); we nonetheless agree with the trial court that a possibility exists that Lewis could be prosecuted for crimes relating to the death of Blue if his testimony were compelled.[13] The complex factual circumstances of this case involve two victims, two assailants, and more than two shots being fired by each assailant over a span of time. The record is unclear whether, in charging Lewis with attempted assault in the first degree, the state was charging him with having assaulted Blue or James. Although the transcript of Lewis' plea hearing reflects a discussion of two victims, the transcript of his plea and sentencing hearings indicate that Lewis was being charged with attempt to commit an assault on James, the "victim" who was not physically harmed by the shootings. Yet, at the respondent's transfer hearing, Sergeant Vaughn Maher, the officer in charge of the investigation of the August 13, 1990 shooting, testified that Lewis had been arrested solely because of his conduct vis-a-vis Blue, the victim who was killed. The long form information, charging Lewis with attempted assault in the first degree, does not specify the particular victim to whom the charge referred. In light of these ambiguities concerning the scope and nature of Lewis' guilty plea, the trial court could not be certain that applica-

---

[12] The United States Supreme Court fashioned the following test for determining whether several offenses charged in a single prosecution are sufficiently different to permit the imposition of multiple sentences without violating the double jeopardy clause: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger* v. *United States,* 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[13] We draw this conclusion without, however, deciding the underlying double jeopardy issue of this matter.

tion of the *Lonergan* standard would exclude the possibility that Lewis would be tried in the future for the murder of Blue.

The respondent maintains, however, that a different ruling is required by *State* v. *Nelson,* 23 Conn. App. 215, 579 A.2d 1104, cert. denied, 216 Conn. 826, 582 A.2d 204 (1990), cert. denied, 499 U.S. 922, 111 S. Ct. 1315, 113 L. Ed. 2d 248 (1991). He maintains that the state is estopped from charging a greater offense than that pleaded to in relation to a particular incident if the state has failed to reserve the right to future prosecution in a plea agreement. This interpretation is overbroad and misplaced. *Nelson* involved an assertion by a defendant who was the party to a plea agreement that the prosecutor had violated that plea agreement. The defendant in *Nelson* had pleaded guilty to assault in the second degree with a motor vehicle at a time when all parties knew the condition of the single victim was serious and life threatening. Id., 219. The Appellate Court held that *"[u]nder the circumstances, it was incumbent upon the state to enunciate what was and was not covered by the agreement lest the defendant be allowed to go to plea under the impression that the criminal portion of this tragic episode was closed."* (Emphasis added.) Id. *Nelson* is inapposite in the circumstances of this case, in which the exact scope of Lewis' plea is uncertain. The trial court had no obligation to conduct a separate trial to determine the intentions of the parties to a plea agreement to which the respondent was not a party.

The judgment is affirmed.

In this opinion the other justices concurred.