George E. **CARTER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–CF–532.

District of Columbia Court of Appeals.

Submitted Dec. 9, 1993.

Decided June 13, 1994.

---

**6.** At the time of the hearing, B.S. testified that physical therapy helped to alleviate her back pains.

John T. Moran, Washington, DC, appointed by the court, filed a brief for appellant.

Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Thomas C. Black, Ronald Dixon, and Clendon H. Lee, Jr., Asst. U.S. Attys., Washington, DC, filed a brief for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

George E. Carter was convicted by a jury of two counts of armed robbery[1] and one count of carrying a pistol without a license.[2] His principal contention on appeal is that the trial judge committed reversible error by sustaining the invocation by his younger brother, Craig Carter, of the brother's privilege against self-incrimination. We remand for further proceedings.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. The Jaggers Inquiry.

The two complainants, Gregory Edmonds and Moses Williams, testified that George Carter and another man robbed them at gunpoint of jewelry, money, and other possessions. Both complainants were previously acquainted with George Carter.

Carter called his brother, Craig Carter, as a defense witness. He proffered that Craig would testify, among other things, that Edmonds had acknowledged to Craig that he (Edmonds) did not know who had robbed him. Craig Carter was also expected to testify that Edmonds had sold Craig drugs and had been using drugs at the time of the alleged robbery. The prosecutor advised the

---

1. D.C.Code §§ 22–2901, –3202 (1989).

2. D.C.Code § 22–3204 (1989).

court that he would seek to cross-examine Craig Carter by inquiring about Craig's own drug use, arguing that such drug use was relevant to Craig's ability to perceive and relate his alleged encounter with Edmonds. The trial judge concluded, without defense objection, that such cross-examination would be permissible at least as to some of Craig Carter's proposed testimony. The judge therefore appointed counsel to advise Craig Carter, who was incarcerated at the time, with respect to Craig's rights under the Fifth Amendment. Craig Carter was then questioned outside the presence of the jury and, upon the advice of his attorney, stated that he would invoke his privilege against self-incrimination with respect to any questions that might be posed to him with regard to his use of unlawful drugs. Craig Carter's counsel argued that his client's answers to such questions could subject him to prosecution for unlawful possession of a controlled substance, and might also have adverse consequences for Craig's prospects for parole.

The trial judge made a conscientious and comprehensive inquiry which was designed to determine "whether the risk of prosecution [was] substantial and real and not merely fanciful." *See Jaggers v. United States,* 482 A.2d 786, 793 (D.C.1984) (per curiam) (citations omitted). During the course of that inquiry, George Carter's counsel proffered that Craig Carter had been a resident of a halfway house both in May 1986 (when Edmonds allegedly sold him heroin) and in July 1986 (when Edmonds allegedly admitted not knowing who robbed him), that test samples of Craig's urine had been dirty in May, June and July of 1986, and that Craig's work release privileges had been revoked and "that is why he is where he is." Defense counsel argued that it would be "utterly unreasonable" to assume that Craig Carter would be prosecuted on the basis of historical evidence for simple possession of PCP a year and a half before the trial, or that "the parole board will punish him twice."

In response to the judge's inquiry regarding the government's position, the prosecutor stated that "we will not immunize [Craig Carter] in advance ... without [eliciting]

from the witness all the facts underlying the witness' alleged criminal activity." Dissatisfied with this conclusory answer, the judge telephoned Alan Strasser, then the Chief of the Felony Trial Division of the United States Attorney's office. With Mr. Strasser on the telephone, the judge described the government's position as follows:

[Mr. Strasser] says, you know, that as a matter of fact it is rare—and I think that I would agree with the conclusion, that it is rare—extremely unusual for the government to ever prosecute misdemeanor drug possessions based on historical testimony.

He notes that on the other hand in an occasional narcotics conspiracy case where there is historical testimony or evidence that is relevant as part of the evidence in the conspiracy, he says to the extent that the government is being asked to predict what they will do in this matter, he says that he is unwilling to respond to that question, and he is also unwilling to say up front that he will grant immunity.

Through the office of the Superior Court's legal adviser, the judge also contacted Gladys Mack, who was then the chairperson of the District of Columbia Board of Parole. Ms. Mack reported

that if the parole board learned that [Craig Carter] was using drugs over a longer period of time, or chronically or routinely rather than just the one or two times, three times—or whatever number of times his urine tested positive, that she could not rule out the possibility that he would ... be treated more harshly by the parole board if he were up for parole.

## B. The Trial Judge's Initial Ruling.

Recognizing the importance to the defense of the right to call potentially exculpatory witnesses, the judge was plainly troubled by the impact which Craig Carter's exercise of his rights under the Fifth Amendment could have on his older brother's rights under the Sixth Amendment. The judge repeatedly voiced skepticism that Craig Carter faced a realistic threat either of prosecution [3] or of

---

**3.** "Frankly, it seems to me unlikely that the government, just based on drug use alone, testimony

deferment of parole.[4] He asked rhetorically whether Craig's sworn admission would be used against him "[e]ven where they already know about that drug use and have penalized him for it." Following his conversation with Mr. Strasser, the judge opined that "while you can't say that the risk of prosecution is fanciful ... the experiential element factored in here seems to me to suggest that it is not very realistic." The judge stated that "with reference to the government's position [as to] possible prosecution in this case, I find it a very, very difficult issue to resolve, if that were standing alone." Noting that Ms. Mack had declined to rule out the possibility of harsher treatment on parole if chronic or routine drug use were shown, however, the judge found this to be a "serious concern." He stated that potential adverse action by the parole authorities "is a valid consideration for [Craig Carter] in determining whether to assert the Fifth Amendment privilege." The judge then concluded that, while the possibility of prosecution was not "fanciful,"

> I am not sure on the other hand, that I can conclude that the risk of prosecution is substantial and real, standing alone. The court in *Jaggers* counter-posed those as opposites. It seems to me that there is some interim territory in there that we haven't covered.
>
> I guess I would say ... that the prospect of prosecution in this case is real, albeit not substantial.
>
> But it does seem to me that the parole implications are not only real but significant in view of what I have learned from Miss Mack and through Mr. Erhardt.
>
> Consequently, I am going to rule in this case that Mr. Craig Carter does have a Fifth Amendment right not to testify, and that it is being properly asserted in this case.

## C. The Judge's Revised Ruling.

Following the judge's initial ruling, the trial continued. After the lunch break, however, the judge reopened the issue. He stated that he had read additional authorities, and that he "was not nearly as satisfied as he [had been] that the assertion of a Fifth Amendment privilege validly lies where the only danger sought to be protected against would be a revocation or denial of one's parole or probation status."

After extensive further discussion with counsel, however, the judge again sustained Craig Carter's claim of privilege, now relying solely on the possibility that Craig would face further criminal prosecution if he were compelled to acknowledge past drug use:

> THE COURT: *Jackson v. United States,* 490 A.2d 192 [D.C.1985], which is I think the most—probably the most recent case, at least in the four that I have looked at, the court talks about it being *the legal possibility of subsequent prosecution rather than the practical likelihood of its coming to pass,* as it determines the existence of the privilege so long as that legal possibility is real and not trifling.
>
> I guess in view of everything that I have heard from Mr. Stern and in view of *Jackson,* I am inclined to abide by my ruling of this morning.

(Emphasis added.) During the course of his discussion of the issue, the judge made at least five separate references to the "legal possibility" of prosecution as the decisive factor with respect to Craig Carter's claim of privilege.

The defense did not altogether lose the right to present Craig Carter's testimony. The judge ruled that Craig would be permitted to testify regarding George Carter's personal appearance at the time of the offense,[5] and that if Craig's direct testimony was confined to that subject, the prosecution would not be permitted to cross-examine him as to

---

on drug use, would come back and say that it is reasonably probable that there is a reasonable prospect they would prosecute this man."

**4.** "It seems to me that in light of what [counsel] told me about the parole board the prospects of this affecting his parole are not substantial."

**5.** This testimony related to an aspect of George Carter's misidentification defense and is not here relevant.

his prior drug use.[6] Craig Carter did testify to this limited extent. In light of the judge's ruling on Craig's invocation of his privilege, however, the defense was not able to present any testimony as to Edmonds' alleged admission that he did not know the robber or as to Edmonds' sale of unlawful drugs to Craig.

George Carter was convicted of all charges. This appeal followed.

## II.

## LEGAL DISCUSSION

*A. The Road Not Taken.*

In *(James) Harris v. United States,* 614 A.2d 1277, 1281–82 (D.C.1992), we synopsized the basic legal principles applicable to the issue here presented as follows:

> As the trial judge explicitly recognized, a criminal defendant's right to present witnesses in his own defense is a fundamental one. *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C.1989). Nevertheless, "in the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Id.* "Because both rights are so precious ... and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision." *Id.*

In situations of this kind the judge must attempt to accommodate not only the interests of the witness and of the defendant, but also the right of the prosecutor to cross-examine defense witnesses. "[T]he use of unlawful drugs is a proper subject of inquiry going to the credibility of a witness and his recollection of the events in question." *Coates v. United States,* 558 A.2d 1148, 1152–53 (D.C.1989) (citations omitted). Thus, in the present case, the prosecutor was also asserting a legitimate interest.

Was this a case in which all three of these interests could have been satisfactorily accommodated? With the incalculable benefit of hindsight, *see Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and with a far more extensive opportunity to consider the question than was available to the trial judge and to trial counsel, we think that it may well have been. It was undisputed that Craig Carter's urine had tested "dirty" at the relevant times. It was likewise undisputed that Craig's halfway house privileges had been revoked on that account. If the parties had stipulated to these facts, or if the prosecutor had been limited to inquiring into the results of the drug *tests* (rather than into Craig's possession and use of drugs), then the government's interest in impeaching Craig's recollection of events, as well as his credibility, might have been substantially vindicated without the preclusion of Craig's testimony. The difference, for purposes of showing that Craig's memory and judgment may have been impaired, between "dirty" drug tests on the one hand, and an admission by the witness that he used PCP on the other, would have been minimal.[7]

So far as we can discern, the prosecution would probably have lost very little, if anything, if its cross-examination of Craig Carter had been restricted to this limited degree. The scope and extent of cross-examination are committed to the trial court's sound discretion. *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990). It would therefore arguably have been at least permissible for the judge to confine the prosecutor to questions about the drug tests, to proscribe questions regarding Craig's possession of PCP, and to avoid in this manner the loss to the defendant of his brother's relevant testimony—a far more serious consequence than a comparatively minor restriction of one aspect of the prosecutor's cross-examination.

Moreover, additional inquiry by the judge and by counsel might have revealed that the prosecutor's proposed cross-exami-

---

6. The prosecutor claimed the right to cross-examine on drug use even if Craig testified only that "the sky is blue."

7. For Craig Carter, on the other hand, the difference is a significant one. Whether he could or would have been prosecuted on the basis of urine tests taken a year and a half earlier, is problematic. A combination of urine tests and an admission, under oath, of unlawful possession of PCP would have provided the government with far more prosecutive ammunition.

nation as to Craig Carter's drug use at the relevant times, even if allowed, would not have required Craig to admit anything that he had not previously acknowledged. Craig's halfway house privileges having been revoked, there may have been a revocation hearing in which the issue of his use of narcotics was adjudicated. *Cf. Morrissey v. Brewer*, 408 U.S. 471, 489–90, 92 S.Ct. 2593, 2604–05, 33 L.Ed.2d 484 (1972). The record does not disclose whether Craig testified at such a hearing or, if he did, whether he admitted or denied drug use at the relevant times. If he made admissions at a revocation hearing equivalent to those which would have been elicited from him at his brother's trial, then his privilege would no longer have been available. *See (James) Harris, supra*, 614 A.2d at 1283. Here, as in *(James) Harris*,

> [t]he focus of the inquiry should therefore have been on whether Martin would have been exposed to a substantial *incremental* risk of incrimination if he had been required to testify as a defense witness at the trial. The parties never addressed this question, and the trial judge never resolved it.

*Id.* (emphasis in original).

In this case, however, the judge and the attorneys were engaged in a thoughtful attempt to resolve a complex constitutional issue, and these possible solutions eluded them. Indeed, no such proposed resolution was presented to the trial court, or even to this court. The judge specifically asked counsel for George Carter if she had any basis for objecting to cross-examination by the prosecution with respect to Craig Carter's alleged use of PCP in July 1986. Counsel responded that "[o]bviously, I don't want him to be able to cross-examine, but I don't legally see how I can prohibit it." The defense likewise proffered nothing with respect to any testimony that Craig Carter may have given, or admissions that he may have made, during any revocation proceedings.

■ "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the

Court." Super.Ct.Crim.R. 52(b).[8] One might theoretically pose the question whether the trial judge committed plain error by not intervening, *sua sponte*, either to impose a restriction on the government's cross-examination (when defense counsel never requested such a restriction) or to embark upon an investigation of what occurred at any prior revocation proceedings (when no party had asked that he do so). *Cf. Irick v. United States*, 565 A.2d 26, 33 (D.C.1989). We note, however, that even on appeal, defense counsel has not suggested that the judge should have taken either or both of these steps, or that he committed plain error by failing to do so.

■ To meet the rigorous standards of Rule 52(b), we must be satisfied that any alleged plain error was "obvious or readily apparent." *(Thomas) Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc); *Foreman v. United States*, 633 A.2d 792, 795 (D.C.1993). The error must be "clear under current law." *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993); *Foreman, supra*, 633 A.2d at 795. We will not reverse for plain error unless a miscarriage of justice would otherwise result. *(Thomas) Harris, supra*, 602 A.2d at 159. Although the loss of a potential exculpatory witness is not a trivial matter, we are satisfied that there was no plain error here, if error at all; none of our hindsight-inspired observations could or should have been obvious to the trial judge.

*B. The Scope of Review.*

Although this court has frequently had occasion to consider trial court rulings regarding the invocation by defense witnesses of the privilege against self-incrimination, appellate counsel have not cited to us, nor has our own research identified, any decision by this court explicitly addressing the proper scope of appellate review. In the present case, which the trial judge correctly described as a very close one, the standard of

---

8. A court may consider a potentially dispositive issue even if the parties have failed to identify it. *See, e.g., Outlaw v. United States*, 632 A.2d 408, 410 n. 7 (D.C.1993) (citation omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 1326, 127 L.Ed.2d 674 (1994).

review is at least potentially decisive. Accordingly, we address that question directly.

In *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Supreme Court stated that

> [t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. *The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."* See Taft, J., in *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio, 1896).

*Id.* 341 U.S. at 486–87, 71 S.Ct. at 818 (emphasis added).[9] The underscored language has been construed by some courts as investing the trial judge with "wide discretion" in resolving a self-incrimination claim. *See, e.g., United States v. Melchor Moreno*, 536 F.2d 1042, 1050 & n. 10 (5th Cir.1976) (abuse of discretion standard is implicit in Supreme Court's allusion in *Hoffman* to judge's "personal perception"); *see also United States v. Van Deveen*, 577 F.2d 1016, 1017 (5th Cir. 1978) (per curiam); *State v. Parker*, 79 Wash.2d 326, 485 P.2d 60, 63 (1971); *State v. Kelly*, 71 So.2d 887, 897 (Fla.1954); *Commonwealth v. West*, 321 Pa.Super. 329, 468 A.2d 503, 505 (1983).

Courts which apply the abuse of discretion standard have nevertheless reversed convictions where the defendant's constitutional rights have been substantially undervalued. *Melchor Moreno, supra*, 536 F.2d at 1050; *United States v. Chase*, 281 F.2d 225, 227–29 (7th Cir.1960). In *Chase*, for example, the court held that the trial judge's exercise of his discretion in rejecting the defendant's invocation of the privilege against self-incrimination was undermined by his failure to apply the relevant law as declared by the Supreme Court.[10]

Although a number of courts have adopted the "abuse of discretion" standard, we question the soundness of such an analytical framework. "Discretion signifies choice." *Johnson v. United States*, 398 A.2d 354, 361 (D.C.1979). A decision can fairly be viewed as having been entrusted to the trial court's discretion if the judge is authorized to elect between a range of permissible alternatives. Where an exercise of discretion is called for, no single conclusion is preordained. *Id.* "[T]he decision maker, and not the law, decides." *Id.*

■ This was not the kind of choice which the trial judge was called upon to make in the present case. If the risk that a witness will be prosecuted is real and not merely fanciful, the court *must* sustain the invocation of the privilege; the Fifth Amendment demands no less. *See, e.g., Jaggers, supra*, 482 A.2d at 793. If, on the other hand, the risk is merely fanciful, then the judge *must* reject the claim of privilege and permit the defendant to adduce the testimony of the witness; this is the command of the Sixth Amendment.

■ In order to determine whether the danger to the witness is sufficient to satisfy *Jaggers*, the judge must assess what may plausibly happen in the future, both in terms of what the prosecutor will have the legal authority to do, and in relation to what he may in fact do. *See Wilson, supra*, 558 A.2d at 1141; *Irby v. United States*, 585 A.2d 759, 763–64 (D.C.1991). In making this inquiry, the judge is, in our view, confronted with identifiable questions of law and fact, and not with a discretionary choice between permissible alternatives. The scope of our review must be fashioned accordingly. *See, e.g.,*

9. In his reply brief, counsel for George Carter construes *Jaggers* as supporting an abuse of discretion standard. As we read that decision, the issue was neither addressed nor decided, although the court did cite this passage from *Hoffman*.

10. Remarkably, the trial judge had commented, *inter alia*, that "the old familiar friend, the Fifth Amendment, is again invoked for the protection of confessed criminals.... In my judgment, the simplest kind of decency and honesty require a stricter and a more reasonable interpretation and application of the Fifth Amendment than has heretofore been accorded it by some courts." *Chase*, 281 F.2d at 227.

*Griffin v. United States,* 618 A.2d 114, 118 (D.C.1992).

■ Properly understood, *Hoffman* is not to the contrary. In observing that the judge must take into consideration "his personal perception of the peculiarities of the case," 341 U.S. at 487, 71 S.Ct. at 818, the Supreme Court was not addressing the question whether appellate review is for "abuse of discretion" (as distinguished, say, from *de novo* review, or from review to determine whether a finding was clearly erroneous). Rather, the Court was implicitly recognizing the reality that the trial judge is present in the courtroom, in the midst of the action. The judge is therefore familiar with the atmospherics of the case and has a feel not only for what is and has been happening, but also for what may be about to happen. An appellate court, on the other hand, must view the proceeding from a lofty perch, far removed from the smells and sounds of battle. Appellate judges have more time than trial judges do to analyze and decide the difficult questions which arise in contested litigation, but they are compelled to act on the basis of a printed record rather than on what a trial judge observes from the perspective of an important participant who occupies an elevated seat in the front row. Given these differences in vantage point, the trial judge's factual and predictive findings (as to the historical facts and as to what the prosecutor may or may not do) must be accorded considerable deference, and may be set aside by an appellate court only if they are clearly erroneous. *Griffin, supra,* 618 A.2d at 117; *see* D.C.Code § 17–305(a) (1989).

■ In considering the trial court's legal conclusions, on the other hand, we apply the non-deferential *de novo* standard.

*Guadalupe v. United States,* 585 A.2d 1348, 1352 n. 7 (D.C.1991); *Griffin, supra,* 618 A.2d at 117. In reviewing the trial court's resolution of a mixed question of fact and law, we consider, among other things, whether the issue to be decided more closely resembles one of fact or of law, and whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy. *United States v. Felder,* 548 A.2d 57, 61–63 (D.C.1988); *Griffin, supra,* 618 A.2d at 117–18. Finally, "where [as here] basic constitutional liberties are implicated, a more searching standard of review may be warranted." *Griffin, supra,* 618 A.2d at 118 (citations omitted).

In the present case, the trial judge made a comprehensive and thoughtful inquiry into the facts, and we readily accept his determinations, both historical and predictive. The more difficult question is whether, as George Carter contends, the judge applied an incorrect legal standard.[11]

## C. The Risk of Prosecution.

■ The basic question which the trial judge was called upon to resolve was whether the risk that Craig Carter would be prosecuted if he was cross-examined about his past drug use was "substantial and real and not merely fanciful." *Jaggers, supra,* 482 A.2d at 793 (citations omitted). The judge understandably found this question to be a close and perplexing one. Initially, he expressed reservations regarding whether the risk of a criminal prosecution for unlawful possession of PCP, standing alone, was sufficient, but he upheld Craig Carter's claim of privilege because Craig also faced what the judge viewed as a realistic prospect that his release on parole might be deferred. The judge eventually abandoned this position,[12] and ruled in-

---

11. Even if we were to review only for abuse of discretion, we have held that judicial discretion must be founded on correct legal principles. *See, e.g., In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991).

12. For all practical purposes, the government now concedes this point, noting authority suggesting that the possibility of parole revocation alone will not support a Fifth Amendment claim. The government goes on to state in footnote 7 to its brief:

*Short v. United States,* 366 A.2d 781 (D.C.1976) establishes that a probation revocation hearing

is not a "criminal prosecution" in which immunized testimony may not be considered. In *Minnesota v. Murphy,* 465 U.S. 420[, 104 S.Ct. 1136, 79 L.Ed.2d 409] (1984), the Supreme Court held that a defendant's Fifth Amendment privilege is not available at a probation revocation hearing as a bar to making the probationer respond to questions that may result in revocation of probation.

Since the government does not press the issue in this case, since its quasi-concession is a plausible one, and since any prosecution of Craig Carter

stead that the result depended on "the legal possibility of subsequent prosecution rather than the practical likelihood of its coming to pass." The judge obviously viewed the likelihood of a prosecution as very slight indeed— Mr. Strasser had conceded as much—but viewed the government's authority to prosecute as decisive.

The judge cited *Jackson, supra,* 490 A.2d 192, as supporting his position. As the government concedes in its brief, however, *Jackson* restates the *Jaggers* test, and there is nothing in that decision to suggest that the determination of Craig Carter's Fifth Amendment claim could turn solely on the prosecutor's legal authority to bring charges against the witness on the basis of the proposed testimony.[13] In fact, the court in *Jackson* specifically noted that, under *Jaggers,* the judge must determine whether "(1) the witness' testimony would be incriminating," and (2) "*if so, whether* the risk of prosecution is substantial and real and not merely fanciful." *Id.* at 196 n. 8 (emphasis added; internal quotation marks omitted). The court added that the trial judge had sufficiently "considered the incriminatory nature of the proposed testimony *and also the likelihood that criminal prosecution would result.*" *Id.* (Emphasis added).

In any event, this court has conclusively rejected the proposition which the trial judge attributed to *Jackson.* In *Jaggers,* we stated that "[o]ne of the questions we must address to resolve the issues presented in this case is whether an absolute legal barrier to prosecution must exist before a witness can be compelled to testify in face of his claim of privilege. We think not." 482 A.2d at 793. In *Wilson, supra,* we reiterated that

> [w]here a witness might legally be prosecuted, but the threat of prosecution is not "real or appreciable," this court has held that the privilege may not properly be invoked.

558 A.2d at 1141 (citing *In re Neal,* 475 A.2d 390, 392 (D.C.1984) (per curiam)). Similarly, in *Irby, supra,* we held that the trial judge must seek a commitment from the prosecutor that the potential defense witness will not be prosecuted, but that even if no commitment is forthcoming, "the trial judge must make an independent assessment, based on all of the circumstances, of the likelihood of prosecution." *Id.,* 585 A.2d at 763–64. In *Irby,* the trial judge made no inquiry regarding the second step, and we therefore remanded for further proceedings.[14] *Id.* at 764.

■ *Neal, Jaggers, Jackson, Wilson, Irby,* and *(James) Harris* thus all address not only the authority of the government to prosecute the witness but also the existence *vel non* of a reasonable possibility that this will come to pass. Since the trial judge ultimately held that the first step alone was sufficient, we must return the case to him to determine, many years after the fact,[15] whether there was a reasonable possibility at

would now be time-barred, so that Craig no longer has an interest in the question, *see* D.C.Code § 23–113(a)(3) (1989), we accept the quasi-concession for purposes of this case. *See Rose v. United States,* 629 A.2d 526, 535–38 (D.C. 1993).

13. *Cf.* 2 Criminal Practice Institute, Trial Manual 28.7 (1993), stating that "[i]t is the legal possibility of a subsequent prosecution, not the practical likelihood of it [sic] coming to pass, that determines the existence of the privilege, provided this possibility is real and not trifling." This sentence is followed by a citation to *Jackson,* but we cannot agree with this reading of *Jackson.*

14. These cases raise an interesting and somewhat perplexing question, which we need not answer here. What, if any, rights may a witness have if the judge orders him to testify, on the grounds that the danger of prosecution is merely fanciful, but the government nevertheless decides

to prosecute the witness and use the compelled testimony? *Compare Lefkowitz v. Turley,* 414 U.S. 70, 78, 94 S.Ct. 316, 322–23, 38 L.Ed.2d 274 (1973) (stating in a different but related context that "if [the witness] is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution") (citations omitted) *with Terrell v. United States,* 294 A.2d 860, 864 (D.C.1972) (court lacks authority to compel a grant of immunity), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1973); *see also Wilson, supra,* 558 A.2d at 1140–41 & n. 9; Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses,* 91 Harv.L.Rev. 1266 (1978) (cited in *Jaggers, supra,* 482 A.2d at 795 n. 7).

15. The inordinate delay in bringing this appeal to fruition appears to have resulted from repeated requests by prior defense counsel for delay in filing appellant's brief, evidently because of difficulties in obtaining portions of the transcript.

the time of trial that Craig Carter would be prosecuted, or to put it another way, whether the possibility of prosecution was "real" or merely "fanciful."[16] This determination must be made on the basis of all of the circumstances, including the fact that possession of PCP is itself a crime (and not simply a fact in a chain that might lead to the discovery of a crime), that Craig's use of PCP had been known to correctional authorities for a year and a half, that his halfway house privileges had been revoked, and that, according to Mr. Strasser, misdemeanor prosecutions for unlawful drug possession, based on historical evidence, are most unusu-

al.[17] We are satisfied that if the judge concludes that Craig Carter's claim of privilege was improperly sustained, the error was prejudicial, rather than harmless beyond a reasonable doubt.[18] In that event, the judge must set aside George Carter's convictions.

## III.

## CONCLUSION

For the foregoing reasons, the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*[19]

---

**16.** We agree with the trial judge that if the risk was "real," that was sufficient. We construe the word "substantial" as used in *Jaggers*, 482 A.2d at 793, as a synonym of "real" (contrasting with "fanciful") and not as meaning "considerable."

**17.** In his dissenting opinion, Judge Gallagher relies on *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir.1958), and on a substantial number of other decisions from various jurisdictions, which would limit the trial judge's inquiry, in assessing a witness' Fifth Amendment claim, to the question whether prosecution of the witness would be legally possible (rather than reasonably possible). The claims of privilege in *Miranti* (and in most of the other cases relied on by Judge Gallagher) were asserted by witnesses whose testimony the government was seeking to compel, and not by prospective defense witnesses. There was thus no actual or potential collision between the rights of an accused under the Sixth Amendment and a witness' privilege against self-incrimination, and there was no occasion for the courts to attempt to balance or reconcile these basic constitutional protections. *Cf. Wilson, supra*, 558 A.2d at 1140 (because forced election between Fifth and Sixth Amendment rights is so painful, courts must attempt to preserve them both to a reasonable extent).

A few courts have followed the analysis utilized in *Miranti* even where the privilege has been asserted by a defense witness whose testimony a criminal defendant has sought to compel. *See, e.g., Commonwealth v. Francis*, 375 Mass. 211, 375 N.E.2d 1221, 1224–25, *cert. denied*, 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 185 (1978); *In re Keijam T.*, 226 Conn. 497, 628 A.2d 562, 565–66 (1993). In *Francis*, the court explicitly "reject[ed] the defendant's contention that we should attempt to 'balance' his rights under the Sixth Amendment against his [witness'] decision to invoke the Fifth Amendment." 375 N.E.2d at 1224. This approach apparently permits a purely theoretical possibility that a witness could be prosecuted to deprive a criminal defendant of potentially exculpatory testimony which may be essential to his defense. *See Wilson, supra*, 558

A.2d at 1140, and authorities there cited; *(James) Harris, supra*, 614 A.2d at 1283 n. 10.

We do not here attempt to explore the adoption of the approach taken by *Francis*, because no such course of action is available to a division of this court. In the context of an assertion of a Fifth Amendment claim by a defense witness, this court has, at least since *Neal* and *Jaggers*, repeatedly rejected the notion that the legal possibility of prosecution is sufficient, standing alone, to sustain the invocation of the privilege. *See* authorities cited in text, *supra*, at 357–58. If we were to assume, as Judge Gallagher suggests, that there is tension between the *Jaggers* line of cases and *Alston v. United States*, 383 A.2d 307, 312 (D.C.1978)—and *Alston's* actual holding, in our view, appears quite limited and can be reconciled with *Jaggers*—the government has not argued in this case that *Jaggers* was wrongly decided or that we should decline to follow that now oft-cited decision. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). Accordingly, in the consequent absence of briefing and oral argument by both sides, and in light of *M.A.P. v. Ryan*, the substantial and difficult issues raised by Judge Gallagher are not ripe for resolution in this appeal.

**18.** *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1968); *Davis v. United States*, 564 A.2d 31 (D.C.1989) (en banc).

**19.** George Carter also contends that the trial judge erred in admitting evidence that, at the time of his arrest, seventeen days after the robbery, he was in possession of a handgun similar to the one with which the offense was committed. According to prosecution testimony, the weapon was distinctive and somewhat unique; defense witnesses maintained that it was neither. The government maintains that the evidence was not incriminating, since it was not shown that Carter had no license for the weapon at the time of his arrest. But the prosecution proved that he had no license seventeen days earlier, and we take judicial notice of the fact that this appellant,

GALLAGHER, Senior Judge, dissenting:

Historically, there has been a continuing tension between the accused's Sixth Amendment right of compulsory process to obtain witnesses in the defendant's behalf and the witness' Fifth Amendment right against self-incrimination. Sometimes, particularly in times of political stress, this tension exists because there is a popular pressure to bring out the facts at the expense of the individual's Fifth Amendment protections against self-incrimination.

Interestingly, the net effect of the court's opinion here is to project the judiciary into the domain of the executive branch. This executive function occurs when the court opines that there is no risk of prosecution, not because the testimony will not be incriminating, but on this court's determination of present and future prosecutive policy. This is where I depart.

It is true that the trial judge, on a claim of the privilege against self-incrimination, should determine if the claim is fanciful. However, the nuances of what is fanciful, or some such test, is not very important here. In this case, we have no question about whether the claim of the privilege against self-incrimination is fanciful. The proposed testimony will be an admission of guilt, that is, a confession of possession of a controlled substance and thereby a violation of a criminal statute. There is nothing fanciful about that potential criminal liability.

Where the clash between the judiciary and the executive function came in this case was when the executive branch represented to the judiciary branch that "we will not immunize [Craig Carter] in advance ... without [eliciting] from the witness all the facts underlying the witness' alleged criminal ac-

tivity." The government position was related by the trial judge as follows:

as a matter of fact it is rare—and I think that I would agree with the conclusion, that it is rare—extremely unusual for the government to ever prosecute misdemeanor drug possessions based on historical testimony.

[The government] notes that on the other hand in an occasional narcotics conspiracy case where there is historical testimony or evidence that is relevant as part of the evidence in the conspiracy, [the government] says to the extent that the government is being asked to predict what they will do in this matter, [the government] says that [the government] is unwilling to respond to that question, and [the government] is also unwilling to say up front that [it] will grant immunity.

The majority opinion describes the choice before the judge as follows:

If the risk that a witness will be prosecuted is real and not merely fanciful, the court *must* sustain the invocation of the privilege; the Fifth Amendment demands no less. If, on the other hand, the risk is merely fanciful, then the judge *must* reject the claim of privilege and permit the defendant to adduce the testimony of the witness; this is the command of the Sixth Amendment.

*Ante* at 355 (citation omitted) (emphasis in original). The majority concludes that "the judge must assess what may plausibly happen in the future, both in terms of what the prosecutor will have the legal authority to do, and in relation to what he may in fact do." *Ante* at 355. I disagree with the majority's conclusion that the judge must and should

who had a substantial criminal record, could not have obtained a license in the intervening two and a half weeks. We therefore agree with Carter that the evidence was at least "minimally in the nature of a criminal offense," *Bigelow v. United States*, 498 A.2d 210, 212 (D.C.1985) (citations omitted), and reject the government's excessively doctrinal and insufficiently realistic contention to the contrary.

We agree with the government, however, that the weapon in this case was properly admitted as evidence of the crime charged, for if the prosecution witnesses were believed, it was linked both

to the defendant and to the crime. *See, e.g., King v. United States*, 618 A.2d 727, 729 (D.C.1993). It would be a remarkable coincidence if a person wrongly accused of a robbery had in his possession a weapon so similar to the one used by the robber. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C.1992). To the extent that this issue translates into one of weighing probative value against prejudicial effect, admission of the evidence was not an abuse of discretion.

make an assessment about future likelihood of prosecution. The future, and a grant of immunity, are solely within the prosecutor's discretion. Here, the prosecutor specifically refused a grant of immunity to the witness. This is a significant consideration in this case.

I agree with the overwhelming majority of cases across the land, especially in the federal circuits, which have determined that the judge should not speculate about or predict the likelihood of prosecution in relation to an assertion of the privilege against self-incrimination. *See, e.g., United States v. Sharp,* 920 F.2d 1167, 1171 (4th Cir.1990) (stating that "courts should not engage in raw speculation as to whether the government will actually prosecute"); *United States v. Edgerton,* 734 F.2d 913, 921 (2d Cir.1984) (stating that the judge should not predict the likelihood of prosecution); *United States v. Jones,* 703 F.2d 473, 477–78 (10th Cir.1983) (holding that a court "should not attempt to speculate whether the witness will in fact be prosecuted" despite an affidavit stating that no criminal prosecution is underway); *In re Corrugated Container Antitrust Litigation,* 661 F.2d 1145, 1151 (7th Cir.1981) (stating that "validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution"), *aff'd sub nom. Pillsbury Co. v. Conboy,* 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983); *In re Corrugated Container Antitrust Litigation,* 620 F.2d 1086, 1091–92 (7th Cir.1980) (stating that the judge should not predict the likelihood of prosecution), *cert. denied sub nom. Adams Extract Co. v. Franey,* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981); *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir.1979) (stating that "we cannot agree that a witness' constitutional privilege against self-incrimination depends upon a judge's prediction of the likelihood of prosecution"); *In re Keijam T.,* 628 A.2d 562, 566 (Conn.1993) (stating that the test is possibility of prosecution rather than likelihood of prosecution).

"The rarity of prosecutions under a particular statute, or a prosecuting attorney's indication in a particular case that he will not prosecute, are not sufficient to defeat a claim of privilege" against self-incrimination. *Choi*

*v. State,* 316 Md. 529, 560 A.2d 1108, 1112 (1989). In *United States v. Miranti,* 253 F.2d 135, 139 (2d Cir.1958), the court answered the same question this court is asked to answer in this case: "whether or not a witness can invoke his privilege against self-incrimination where practically there is only a slight possibility of prosecution." The *Miranti* court answered the question as follows:

> We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor.

*Id.* at 139 (footnote omitted); *see also In re Corrugated Container Antitrust Litigation, supra,* 661 F.2d at 1151 (concluding that "The validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution because the past and present behavior of prosecutorial authority is not a sufficiently accurate indication of the risk of criminal prosecution.").

The government's present intent to prosecute the crime does not affect the Fifth Amendment claim. *United States v. Chase,* 281 F.2d 225 (7th Cir.1960). In fact, reliance upon statements by the government that they will not prosecute or are not intending to prosecute will not extinguish the witness' privilege against self-incrimination. *See Estate of Fisher v. C.I.R.,* 905 F.2d 645, 649 (2d Cir.1990); *Sharp, supra,* 920 F.2d at 1171; *Edgerton, supra,* 734 F.2d at 921 n. 10; *United States v. Johnson,* 488 F.2d 1206, 1209 n. 2 (1st Cir.1973); *Choi, supra,* 560 A.2d at 1112. Nor will the practical assessment of the reality of prosecution defeat the privilege against self-incrimination. *See In re Master Key Litigation,* 507 F.2d 292, 293 (9th Cir.1974); *Commonwealth v. Francis,* 375 Mass. 211, 375 N.E.2d 1221, 1225, *cert. denied sub nom. Francis v. Massachusetts,* 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 185

(1978); *Commonwealth v. Colantonio,* 31 Mass.App.Ct. 299, 577 N.E.2d 314, 318 (1991), *review denied,* 414 Mass. 1105, 617 N.E.2d 639 (1993); *In re Knapp,* 536 So.2d 1330 (Miss.1988); *Grant v. State,* 83 Wis.2d 77, 264 N.W.2d 587, 590–91 (1978). "Surely a witness need not be forced to testify on the assumption of prosecutorial sympathy or laxity." *Francis, supra,* 375 N.E.2d at 1225.

The majority, while ignoring most other jurisdictions, attempts to specify what a trial court should do after it has determined that testifying might incriminate the witness. However, as one court well stated:

if the answers might incriminate, the court must then determine whether there is even a remote risk that the witness will be prosecuted for the criminal activities. However, this determination does not depend on the judge's prediction of the likelihood of prosecution. Only if the possibility is "fanciful" will the privilege be denied. *In Re Folding Carton Antitrust Litigation,* 609 F.2d 867, 870 (7th Cir.1979). This standard has been labeled the "absolute bar" test in *In Re Corrugated Container Antitrust Litigation,* 661 F.2d 1145, 1151 (7th Cir.1981): Absent an absolute bar to subsequent prosecution, e.g., statute of limitations, or double jeopardy, "a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of Fifth Amendment privilege."

*Mississippi State Bar v. Attorney L,* 511 So.2d 119, 124 (Miss.1987). Thus, a court may only assess the possibility of future prosecution not the probability. *In re Keijam T., supra,* 628 A.2d at 566. "[W]hether 'as a practical matter,' such a prosecution is 'unlikely' has no bearing." *Colantonio, supra,* 577 N.E.2d at 318 (quoting *Francis, supra,* 375 N.E.2d at 1221).

This court should follow most of the federal circuits, in particular, and conclude that only the possibility, not the probability of prosecution is important in determining whether to uphold a witness' privilege against self-incrimination. By this I mean that once the court has determined that the proposed testimony is potentially incriminating, the only evaluation left for the court is one that determines whether there is an absolute bar to subsequent prosecution. As one court explained:

To the extent that an assessment of the probability of prosecution is significant in the trial court's evaluation of an asserted privilege, it is more properly accomplished through examination of the more traditional tests, *viz, statute of limitations, immunity, double jeopardy.* Short of the existence of one of these indicia of *an absolute bar* to subsequent prosecution, a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of fifth amendment privilege.

*In re Folding Carton Litigation, supra,* 609 F.2d at 872 (footnotes omitted) (emphasis added). Once incrimination is determined or ceded, then without an absolute bar to subsequent prosecution in the form of double jeopardy, immunity, or the statute of limitations, the court should uphold the witness' privilege against self-incrimination.

The majority appears to consider itself bound by this court's opinion in *Jaggers v. United States,* 482 A.2d 786 (D.C.1984), and its progeny when it concludes that the court must evaluate the likelihood, in practical real life terms, that the government will prosecute the witness. *Ante* at 356–57. However, as revealed by the dissent in *Jaggers,* this court there impermissibly ignored its earlier precedent[1] in *Alston v. United States,* 383 A.2d 307 (D.C.1987). *Jaggers, supra,* 482 A.2d at 800. In *Alston* we stated:

In the instant case, the possibility of additional prosecution for possessing an unregistered firearm and ammunition for such a weapon was not imaginary. The Corporation Counsel could have initiated charges on the basis of Burton's testimony had it been given at appellant's trial, and could have used it as evidence against Burton in a subsequent trial for violations of the Police Regulations. The danger of further incrimination therefore was real, for although the Corporation Counsel does

---

1. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

not often elect to prosecute under similar circumstances, it would not have been unreasonable or impermissible for it to have done so here. *See generally United States v. Miranti,* 253 F.2d 135, 138–39 (2d Cir. 1958). The trial court thus ruled correctly that Burton could decline to testify at appellant's trial.

*Alston, supra,* 383 A.2d at 312.

The *Alston* decision was consistent with *United States v. Miranti* and, as we see, with the overwhelming number of jurisdictions that do not evaluate the real life chances of prosecution once the incriminatory nature of the testimony is found and the potential for prosecution, however slight, is determined by the court. I, therefore, respectfully dissent and suggest that this court may well consider that it should readdress, *en banc,* its departure from *Alston* in *Jaggers* (in contravention of the rule of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971); and also free the trial court from the executive function and the unrewarding burden of trying to assess the likelihood of future prosecution.

I must take issue with the implication which seems to be left by the majority opinion in note 17: that there is no binding law that an accused's right under the Sixth Amendment to compel testimony must give way to a witness' Fifth Amendment privilege against self-incrimination. However, this implication disregards what the Supreme Court of the United States has stated when the Sixth Amendment power to compel testimony clashes with the Fifth Amendment. In *Kastigar v. United States,* the Court concluded:

> The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor.
>
> \* \* \* \* \* \*
>
> But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be used. The Court has been zealous to safeguard the values that underlie the privilege.

406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972) (footnotes omitted). Thus, as the Supreme Court says, a defendant's right to the benefit of exculpatory testimony must yield to the witness' privilege against self-incrimination. *United States v. Bowe,* 698 F.2d 560, 565 (2d Cir.1983); *Horne v. State,* 321 Md. 547, 583 A.2d 726, 728 (1991).

As matters stand, the net effect of the majority opinion would be to elevate the Sixth Amendment right of compulsory process to obtain witnesses in the defendant's behalf to a superior position over the self-incrimination provision of the Fifth Amendment notwithstanding the Supreme Court's clear expressions preventing this result and this where there is no actual dispute on whether the particular testimony would be incriminating. Under these circumstances, when there is a conflict between the Sixth Amendment rights of the accused and the Fifth Amendment privilege of the witness, the right to compel testimony must yield to the witness' privilege against self-incrimination. *See, e.g., United States v. Khan,* 728 F.2d 676, 678 (5th Cir.1984) (stating that "an accused's right to compulsory process must give way to the witness' Fifth Amendment privilege not to give testimony that would tend to incriminate him"); *United States v. Turkish,* 623 F.2d 769, 774 (2d Cir.1980) (stating that "the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does not carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination"), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *United*

*States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.) (stating that "The Sixth Amendment right of an accused to compulsory process to secure the attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *State v. Simms,* 170 Conn. 206, 365 A.2d 821, 823 (stating same), *cert. denied,* 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 199 (1976); *State v. Ramsey,* 99 Idaho 1, 2–3, 576 P.2d 572, 573–74 (1978) (stating same).